# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| MICHELE M. MOLINA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-6632 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| GLENN LATRONICO (Star No. 6589) | ) | |
| and ERIC DAVID (Star No. 6329), | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff brings claims against Defendants for unreasonable seizure, civil conspiracy, and other torts under 42 U.S.C. § 1983 and various state law theories. Before the Court are Defendants' respective motions to dismiss the complaint. See generally [25]; [27]. For the reasons set forth below, Defendants' motions to dismiss are granted with respect to Counts I, II, III, V, VIII, IX, XI, XII, and XIII, and denied with respect to Counts IV, VI, VII, and X. Counts XII and XIII, along with any remaining claims against Defendants in their official capacities, are dismissed with prejudice. The case is set for further status hearing on January 15, 2020 at 9:00 a.m.

## I. Background[1]

The present litigation concerns Plaintiff Michele Molina's arrest by Defendant Eric David and at the behest of Defendant Glenn Latronico. Molina and Latronico first met in August 2015, and Molina met David soon thereafter in January 2016. Although the arrest occurred in September 2016, the details of Molina's background with Defendants are provided for context.

---

[1] For purposes of the motion to dismiss, the Court accepts as true all of Molina's well-pleaded factual allegations and draws all reasonable inferences in her favor. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

## A. August 2015 Accident

Molina and Latronico first became acquainted in August 2015. [24, ¶¶ 6–9.] Molina, at the time a Chicago Police Department (CPD) officer, was driving on the highway while off duty and saw a traffic accident. [*Id.*, ¶ 7.] She called emergency assistance, and Latronico, an Illinois State Trooper, responded to the scene. [*Id.*, ¶¶ 8–9.] Latronico took down Molina's phone number, and the two began exchanging "friendly text messages relating to work, pets and social interests." [*Id.*, ¶¶ 9–10.] Latronico then asked Molina on dates and sent "unsolicited photographs of himself." [*Id.*, ¶ 11.] By September 2015, he asked Molina for her home address, and in November he sent Molina a naked picture of himself. [*Id.*, ¶¶ 12, 14.] Molina neither told Latronico where she lived nor did she reciprocate by sending "inappropriate photographs of herself." [*Id.*, ¶¶ 13, 16.] In fact, the two never dated nor had "intimate physical relations." [*Id.*, ¶ 18.]

## B. January 2016 Traffic Stop and Aftermath

Molina first met David, also an Illinois State Trooper, in January 2016. [*Id.*, ¶ 19.] David pulled Molina over on the highway with the "intent to ticket and/or charge" Molina, presumably for a traffic offense. [*Id.*, ¶¶ 19–20.] In an attempt to get out of the ticket, Molina name-dropped Latronico. [*Id.*, ¶ 21.] David and Latronico then talked on the phone, after which David refused to let Molina off the hook. [*Id.*, ¶ 22.] Molina was saved, however, by some CPD officers who arrived on the scene, told David to leave, and "handled the matter." [*Id.*, ¶ 23.] The CPD did not charge or cite Molina. [*Id.*, ¶ 24.]

When Molina got home, she had a telephone conversation with Latronico about the stop, focusing on David's demeanor. [*Id.*, ¶ 25.] Molina told Latronico that his phone call with David

seemed to exacerbate David's aggressive demeanor and that he "made the situation worse." [*Id.*, ¶ 27.] These statements offended Latronico and he hung up on Molina. [*Id.*, ¶ 28.]

But this wasn't the last that Molina heard from Latronico. "[O]ut of the blue" he reached out to her in September 2016, asking "to sleep at her home as a personal favor." [*Id.*, ¶ 29.] He peppered her with text messages asking for her address and for permission to sleep at her home and "friend requested" Molina on the social-media application Snapchat.[2] [*Id.*, ¶¶ 30, 33, 32.] Molina pointedly refused to tell Latronico her address, and at one point responded angrily, but she did accept his Snapchat request. [*Id.*, ¶¶ 34, 36, 37.]

### C. September 30, 2016 Arrest

On September 30, 2016, Molina went out to the Blue Light Chicago, and took a "snap" of the exterior. [*Id.*, ¶¶ 38–39.] Latronico saw the image on Snapchat, took a screenshot of the Blue Light's image, and sent the screenshot to David. [*Id.*, ¶¶ 40–42.] David, in turn, drove to the Blue Light to wait for Molina. [*Id.*, ¶43.] Molina left the Blue Light and began driving home, trailing her boyfriend's car. [*Id.*, ¶ 44.]

David pulled Molina over a few blocks away from the Blue Light, explaining that she had committed some kind of "minor traffic violation." [*Id.*, ¶ 45–46.] Molina's boyfriend, also a CPD officer, pulled over and tried to walk over to Molina's car. [*Id.*, ¶ 49.] David repeatedly ordered Molina's boyfriend back to his car, while telling Molina that he thought he recognized her and asking Molina about her boyfriend. [*Id.*, ¶¶ 47, 50, 52–54.] Somewhat inexplicably, Molina name-dropped Latronico again, to which David responded, "Latronico? That's my boy." [*Id.*, ¶¶ 55–56.] David then kibitzed with Molina "about her work, dating life, Latronico and the traffic stop for over twenty minutes." [*Id.*, ¶ 57.] While David was stalling, he began getting incoming text

---

[2] Snapchat is an application whereby users can share pictures with their "friends."

messages and snaps from Latronico.  [*Id.*, ¶¶ 58–59.]  According to Molina, David and Latronico stayed in contact in order to plan and execute a plot wherein David would "detain and arrest" Molina and "accuse [her] of committing certain traffic violations."  [*Id.*, ¶¶ 60–61, 64–67.]  Pursuant to this plan, David conducted a field sobriety test (FST), even though Molina "did not show any signs of alcohol consumption."  [*Id.*, ¶¶ 66, 68, 89.]  At this point, "additional Illinois State Troopers" arrived, but David shooed all but one of them away.  [*Id.*, 70–72.]

David told the remaining trooper that he recognized Molina from the January 2016 traffic stop, explaining "we just got confirmation from her that we stopped her a while ago on a very similar situation."[3]  [*Id.*, ¶¶ 72–73.]  David told Molina that he was upset that he had let her go in January, and that, by his lights, the previous stop had not gone well.  [*Id.*, ¶¶ 77, 75.]  In fact, David admitted that he forced her to do the FST because of the January stop.  [*Id.*, ¶ 76.]  David then handcuffed Molina and placed her in the back of his police car.  [*Id.*, ¶ 78.]  Even though Molina "did not show any signs of alcohol consumption," David spent an hour pressuring Molina to take a breathalyzer test.  [*Id.*, ¶¶ 78–79, 86.]  Throughout this hour, during which Molina was handcuffed in the back of the police car, David exchanged text messages with Latronico about how they were going to proceed in their plot to arrest her.  [*Id.*, ¶¶81–83.]  Molina's boyfriend then engaged David in conversation, during which David explained that he only conducted the FST because of Molina's conduct during the January 2016 stop, and that he was upset because during that stop she exhibited "completely unacceptable behavior."  [*Id.*, ¶¶ 84–85, 88.]

After an hour of cajoling, Molina submitted to a breathalyzer analysis.  [*Id.*, ¶ 90.]  David immediately announced that he was taking her into custody and drove her to the First District

---

[3] Molina claims that she did not admit to having been pulled over in January at this time.  [*Id.*, ¶ 74.]

Chicago Police Station, located in the South Loop.[4]  [*Id.*, ¶¶ 91–94.]  Upon arrival at the First District, however, Molina "was not processed, booked or charged"—instead, David left her alone in the parking lot, handcuffed in the back of the police car for half an hour.  [*Id.*, ¶¶ 100, 95–98.] When David returned, he informed her that they were going elsewhere.  [*Id.*, ¶ 99.]

David disabled the police car's dashboard camera (dashcam), and never turned it back on. [*Id.*, ¶¶ 101–02.]  He started driving to the Sixteenth District Chicago Police Station, located on the 5100 block of Milwaukee Avenue (*i.e.*, on the other side of the city).  [*Id.*, ¶ 103.]  David took the scenic route, driving through side streets and texting and calling Latronico all the while.  [*Id.*, ¶¶ 104–105.]  David then pulled out a laptop and began playing dashcam footage taken of Molina during the January 2016 stop, which David mockingly dubbed Molina's "greatest hits."  [*Id.*, ¶¶ 105–06.]  Molina "experienced anguish, humiliation, distress, fear and anxiety," and tearfully begged David to turn the footage off.  [*Id.*, ¶¶ 107, 109.]  David instead "laughed, made demeaning remarks, and continued to let the dashcam footage play."  [*Id.*, ¶ 108.]  David, on the phone with Latronico, mocked Molina, telling Latronico that "he had [Molina] in his custody, she's being real nice now, she's even crying back there, and she's not so uppity."  [*Id.*, ¶¶ 110–11.]  Though Molina could only hear David's side of the conversation, she inferred through his snickering, laughter, and demeaning remarks that Latronico and David were mocking her together.  [*Id.*, ¶¶ 113–14.]  At long last, David and Molina arrived at the Sixteenth District Station.  David again left Molina locked in the backseat of his police car as he went into the station and loitered for 20 minutes.  [*Id.*,

---

[4] Molina pleads that at this point she was arrested [*Id.*, ¶ 91], but as explained below, arrest is a legal conclusion.  See *infra* Section III(B)(1).  The Court therefore infers that David indicated that he would be taking Molina into custody.  Also, because all reasonable inferences must be drawn in favor of the plaintiff, and Molina pled that she "did not show any signs of alcohol consumption" [24, ¶ 89], the Court must infer that her blood-alcohol content as measured by the breathalyzer was below the legal limit (if not zero).

¶ 115.] He came back and said that Molina was not going to be booked or charged, unlocked the backseat, and removed Molina's handcuffs. [*Id.*, ¶¶ 116–117.]

Unfortunately, Molina's troubles did not end there. Molina asked David to call her boyfriend or a rideshare for her, but David refused to "let [her] out of his custody and insisted that he drive her" home.[5] [*Id.*, ¶¶ 118–19.] Even though Molina said that she did not want to be near David or give him her address, he "ordered [Molina] back into his police car." [*Id.*, ¶ 121.] Molina, intimidated and scared of David, did not feel free to leave and thus complied with his order; David did not, at that time, handcuff Molina. [*Id.*, ¶¶ 123–24; 122.] While driving her back, David repeatedly demanded to speak to Molina's boyfriend to get his permission to drop Molina off; Molina was initially apprehensive of giving over her boyfriend's information, but finally relented. [*Id.*, ¶¶ 125–130.] David spoke to her boyfriend and asked his permission to drop Molina off. [*Id.*, ¶ 130.]

David got almost all the way to the boyfriend's residence, but then pulled into a convenience store parking lot two blocks away. [*Id.*, 130–131.] When Molina asked to be let out so that she could walk home, David snickered, started texting, and locked the doors to his police vehicle so that Molina could not exit. [*Id.*, ¶¶ 132–136.] David then made a phone call and told Molina that he would drive her back to the Sixteenth District Office in Jefferson Park. [*Id.*, ¶¶ 137, 139.] Upon arrival at the station, she was charged with driving under the influence of alcohol (along with other minor traffic violations). [*Id.*, ¶¶ 148, 202.]

All told, Molina's ordeal lasted six hours. [*Id.*, 145.] Molina subsequently filed this lawsuit alleging that she was traumatized, necessitated psychological treatment[6], had to pay

---

[5] The complaint does not indicate what happened with the phone Molina used to snap the picture of the Blue Light.

[6] Molina's complaint does not specify what kind of treatment Molina sought following the incident.

litigation fees, was embarrassed, and ultimately was suspended from work. [*Id.*, ¶¶ 153, 205.] And after all that, the Cook County State's Attorney's Office dropped the driving under the influence charges a few months later (though Molina does not recount the disposition of the other minor traffic violations). [*Id.*, ¶ 152.] Molina filed suit [1] alleging various theories under federal and state law. Following motions to dismiss from both Defendants, see generally [19]; [21], she submitted her first amendment complaint [24], which alleges thirteen counts against both David and Latronico. There are four federal claims: a conspiracy to deprive civil rights pursuant to § 1985 (Count I) [*id.*, ¶¶ 154–161], and three violations of the Fourth Amendment's bar on unreasonable seizures pursuant to § 1983 (Counts II–IV) [*id.*, ¶¶ 162–183]. Molina also brings nine state law claims: false imprisonment (Count V) [*id.*, ¶¶ 184–190]; civil conspiracy (Count VI) [*id.*, ¶¶ 191–198]; malicious prosecution (Count VII) [*id.*, ¶¶ 199–212]; unlawful detention (Count VIII) [*id.*, ¶¶ 213–220]; unlawful seizure (Count IX) [*id.*, ¶¶ 221–227]; intentional infliction of emotional distress (Count X) [*id.*, ¶¶ 228–234]; intrusion upon seclusion (Count XI) [*id.*, ¶¶ 235–244]; respondeat superior (Count XII) [*id*, ¶¶ 245–247]; and indemnification (Count XIII) [*id.*, ¶¶ 248–250]. Before the Court are Defendants' respective motions to dismiss. See generally [25 (David's motion)]; [27 (Latronico's motion)].

## II.  Legal Standard

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (alteration in original). Second, the factual allegations in the complaint must be

sufficient to raise the possibility of relief above the "speculative level." *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). Dismissal for failure to state a claim under Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts as true all of Plaintiff's well-pleaded factual allegations and draws all reasonable inferences in Plaintiff's favor. *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). Evaluating whether a "claim is sufficiently plausible to survive a motion to dismiss is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011)).

## III.     Analysis

Molina brings four federal claims against David and Latronico in both their individual and official capacities; eight state law claims against them in their individual and official capacities; and one state law claim in their official capacities. The Court first addresses whether the official capacity claims may be brought against state officials in federal court, and then addresses the surviving claims in turn.

### A.     Official Capacity Suits

Preliminarily, every count in the complaint has at least one component seeking damages from Defendants in their official capacities. Molina may not proceed with any of the official capacity suits. "Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's

office. As such, it is no different from a suit against the State itself." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989) (internal citations omitted) (dismissing § 1983 claims against state officials sued in their official capacity). And under the Supreme Court's interpretation of the Eleventh Amendment, federal courts may not entertain nonconsensual suits against a state. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment.") (citations omitted); see also, *e.g.*, *Maddox v. Love*, 655 F.3d 709, 716 (7th Cir. 2011). Here, Molina is suing both Latronico and David in their official capacities as Illinois State Troopers, and there is no indication that the State of Illinois has consented to suit; these claims are therefore effectively claims against the state that cannot proceed in federal court. *Pennhurst*, 465 U.S. at 100; see also, *e.g.*, *Glanz v. Illinois*, 2017 WL 1232975, *2 (N.D. Ill. April 4, 2017) (granting summary judgment to State on Eleventh Amendment grounds when suit was based on Illinois State Trooper's conduct).[7]

### B.    Count I (Civil Rights Conspiracy)

Section 1985 allows plaintiffs to recover damages from private actors who act to deprive them of their civil rights. Molina advances several arguments in support of this count, but they

---

[7] Illinois has a separate state statute that prevents plaintiffs from suing the state, except for in limited circumstances. State Lawsuit Immunity Act, 745 ILCS 5/1 ("Except as provided [in statutes not at issue here] the State of Illinois shall not be made a defendant or party in any Court.") In limited circumstances, this state statute may extend immunity to individual state employees. *Leetaru v. Board of Trustees of University of Illinois*, 32 N.E.3d 583, 596 (Ill. 2015). While both this state law and the Eleventh Amendment doctrines described above "are often referred to as 'sovereign immunity,' they are not the same." *Murphy v. Smith*, 844 F.3d 653, 656 (7th Cir. 2016). Molina cites to a line of cases that refuse to apply the Illinois *statute* to some individual employees sued in their individual capacities for constitutional violations to argue that "sovereign immunity" should not apply here. See [32 at 5]; [33 at 5–6] (discussing *Murphy* and *Leetaru*). But neither of these cases discuss the *federal constitutional doctrine* of sovereign immunity and are therefore irrelevant to the question of whether these Defendants can be sued in their official capacity in federal court. See *Murphy*, 844 F.3d at 656–60 (distinguishing federal and state "sovereign immunity" and trying to dispel the misconception that they are the same). As explained above, such suits in federal court are barred by the Constitution, as interpreted in the *Pennhurst* doctrine.

are difficult to follow and, in any event, unconvincing red herrings. First, she argues that the § 1985 claim is best thought of as a "class-of-one" equal protection claim and therefore should be allowed to proceed as distinct from the § 1983 claims for unlawful seizure discussed below. Next, Molina argues that this § 1985 claim should be evaluated under the standards for a § 1983 conspiracy, not a § 1985 conspiracy.

Preliminarily, this § 1985 count is superfluous because Molina does not allege a conspiracy involving private actors—rather, she claims that both Latronico and David "acted in their official capacities under the color of law." [24, ¶ 158]; see also [*id.*, ¶ 161]. The entire purpose of § 1985 (as distinct from § 1983 claims against those acting under color of state law) is "to permit recovery from a private actor who has conspired with state actors." *Fairley v. Andrews*, 578 F.3d 518, 526 (7th Cir. 2009). Accordingly, "a conspiracy claim has no role to play" in a suit against state actors and should be dismissed. See *Scott v. City of Chicago*, 619 Fed. Appx. 548, 548 (7th Cir. 2015) (citing *Fairley*, 578 F.3d at 526).

Next, § 1985 claims are not the only vehicle for "class-of-one" equal protection suits.[8] Indeed, such claims, unless they involve a private actor, should be brought pursuant to § 1983. *Scott*, 619 Fed. Appx. at 548  For example, the leading class-of-one case, *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam), was brought under § 1983. See *Olech v. Village of Willowbrook*, 1998 WL 196455, at *1 (N.D. Ill. April 13, 1998). In any event, to the extent that

---

[8] Most of Defendants' briefing regarding the § 1985 claims relates to *purely private* conspiracies to deprive individuals of the equal protection of the law. The Supreme Court has allowed § 1985 suits involving purely private conspiracies only in extremely narrow circumstances. Compare, *e.g.*, *Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971) (allowing suit under § 1985 against purely private conspiracy that sought to prevent racial minorities from exercising their constitutional rights), with *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269–70 (1993) (concluding that a purely private conspiracy to prevent women from obtaining abortions cannot be sued under § 1985). These rules, however, have no applicability in the case at bar, where Molina has alleged a *purely public* conspiracy. As such, the Court need not discuss these arguments or cases.

Molina attempts to raise a class-of-one claim in her complaint, her complaint fails to abide by Rule 8(a)(2)'s notice requirement of "a short plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. Pro. 8(a)(2); see also *Twombly*, 550 U.S. at 555. Even under the lax pre-*Twombly* pleading standards, a class-of-one plaintiff needed to allege that "she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564. Although Molina gestures toward unequal treatment throughout the complaint [24, ¶¶ 51, 85], her § 1985 count failed to give Defendants "fair notice of what the * * * claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555.

Finally, in her response to the motion to dismiss, Molina discusses the legal standard for § 1983 conspiracies, not § 1985 conspiracies. [32 at 10]; [33 at 6–7]. Confusingly, Molina has already had an opportunity to amend her complaint in light of the arguments Defendants raised against the § 1985 claim, and chose not to plead a § 1983 conspiracy. Compare [1, ¶¶111–18 (alleging § 1985 conspiracy)], with [24, ¶¶154–161 (same)]. Given her choice not to amend the complaint to include § 1983 conspiracy claims, the Court infers that Molina attempted to state a claim under § 1985 only. As discussed below in Section III(C)(2) & Section III(D)(3), although Molina may very well be able to plead a federal civil rights conspiracy, she has failed to state such a claim in her complaint, and Count I is therefore dismissed without prejudice.

### C.    Counts II–IV (§ 1983)

Molina attempts to state three § 1983 counts related to her seizure: "False Arrest" under the Fourteenth Amendment; "Unlawful Detention" under the Fourteenth Amendment; and "Unlawful Seizure" under the Fourth Amendment. Preliminarily, a point of clarification is in order. Any constitutional claims related to Molina's seizure by a state trooper derive from *both*

the Fourth and Fourteenth Amendment. The Fourth Amendment prevents federal authorities from engaging in "unreasonable searches and seizures," and the Fourteenth Amendment makes the requirements of the Fourth Amendment applicable to the states. See, *e.g.*, *Mapp v. Ohio*, 367 U.S. 643, 655 (1961) (noting that the Fourteenth Amendment extended the right to be free from unreasonable search and seizure to the states, and holding that suppression is constitutionally mandated in criminal cases). Thus, an unreasonable seizure conducted by a state police officer is a constitutional violation of the Fourth Amendment as made applicable by the Fourteenth. See *Baker v. McCollan*, 443 U.S. 137, 142 (1979).

In view of the foregoing, the Court proceeds only with Count IV, the *Fourth* Amendment unreasonable seizure claim, and Counts II and III are dismissed. The Court first determines whether Molina adequately stated a § 1983 claim for unreasonable seizure against *anyone*, and then moves on to whether Molina stated a claim against Latronico (who was not present during the arrest).

### 1. Reasonableness of seizure

Section 1983 allows an individual to sue any person who, under the color of state law, violates that individual's constitutional rights. 42 U.S.C. § 1983. In this case, Molina claims that Defendants violated the Fourth Amendment, specifically the "right of the people to be secure in their persons * * * against unreasonable searches and seizures." U.S. Const. amend. IV; see also *Martin v. Marinez*, 934 F.3d 594, 598–99 (7th Cir. 2019) (discussing the interplay between § 1983 suits and the Fourth Amendment bar on unreasonable seizures). A person is seized by authorities when a reasonable innocent person would not feel free to leave. *U.S. v. Drayton*, 536 U.S. 194, 200–02 (2002). An arrest is one flavor of seizure; a seizure ripens into "an arrest when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on

freedom of movement of the degree which the law associates with formal arrest." *U.S. v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999) (citation omitted). An arrest only "requires *either* physical force * * * *or*, where that is absent, *submission* to the assertion of authority," *California v. Hodari D.*, 499 U.S. 621, 626 (1991)—the arresting officer need not engage in any formal, ritualistic series of actions such as handcuffing, reading *Miranda* rights, or announcing that the suspect was under arrest.

Arrests must be supported by probable cause, whereas lesser seizures need only be supported by reasonable suspicion. *E.g.*, *United States v. Lopez*, 907 F.3d 472, 478 (7th Cir. 2018) (discussing *Terry v. Ohio*, 392 U.S. 1, 27). Generally speaking, "probable cause is an absolute defense to claims under section 1983 against police officers for an allegedly unreasonable seizure, whether a false arrest or a wrongful pretrial detention." *Norris v. Serrato*, 761 Fed. Appx. 612, 615 (7th Cir. 2019) (citing *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015)). That said, if an officer obtains probable cause partway through an unlawful seizure, he is still liable under § 1983 for the portion of the seizure that occurred before probable cause was obtained. *Martin*, 934 F.3d at 605. Moreover, "no matter how much custody may be permissible * * * the reasonableness of a search or seizure depends on what actually happens rather than what could have happened." *U.S. v. Garcia*, 376 F.3d 648, 651 (7th Cir. 2004).

Thus, even when probable cause exists, constitutional violations may lie when "searches or seizures [were] conducted in an extraordinary manner, unusually harmful to an individual's privacy or even physical interests." *Wren v. U.S.*, 517 U.S. 806, 818 (1996) (collecting egregious examples, including use of deadly force). Although the ordinary incidents of arrest—including being "handcuffed, placed in a squad car, and taken to the local police station," where the police inventory one's possession and take a mug shot—may be "humiliating," they are not so

"extraordinary" as to constitute an unreasonable seizure. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). "Needless delay, or delay for delay's sake—or, worse, delay deliberately created so that the process becomes the punishment—violates the fourth amendment." *Portis v. City of Chicago, Ill.*, 613 F.3d 702, 705 (7th Cir. 2010) (citing *County of Riverside v. McLaughlin*, 500 U.S. 40, 56, 59 (1991)); see also *Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 436–437 (7th Cir. 1986) (explaining that a delay of "four hours requires explanation") (citation omitted); *Chortek v. City of Milwaukee*, 356 F.3d 740, 747 (7th Cir. 2004) (applying the *Gramenos* framework and reciting facts that may justify delays in booking).[9]

Likewise, a "seizure justified only by a police-observed traffic violation, * * * 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation.' " *Rodriguez v. U.S.*, 135 S. Ct. 1609, 1612 (2015) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)) (alterations in original). Thus, if an officer "extend[s] the traffic stop beyond the time necessary to issue the traffic citations," he must have independent reasonable suspicion that additional criminal activity is afoot. *United States v. Rodriguez-Escalera*, 884 F.3d 661, 668 (7th Cir. 2018) (suppressing evidence gathered after officer made small talk with suspect for 22 minutes before issuing citation, while waiting for drug-sniffing dog to arrive). Indeed, "[q]uestioning that prolongs the detention, yet cannot be justified by the purpose of such an investigatory stop, is unreasonable under the fourth amendment." *Lopez*, 907 F.3d at 486 (alteration in original, and internal quotation marks and citation omitted). Importantly, the officer may not delay a stop by asking questions, even if the officer has probable cause to effectuate a custodial arrest. Compare *Rodriguez*, 135 S. Ct. at 1616 ("The reasonableness of a seizure, however, depends on what the police in fact do."), with *id.* at 1622 (Thomas, J.,

---

[9] Importantly, unreasonable arrest or delay of booking are distinct theories from the disallowed "seizure within a seizure" theory. See *Swanigan v. City of Chicago*, 881 F.3d 577, 584 (7th Cir. 2018).

dissenting) (discussing *Atwater*, 532 U.S. at 354–55, and concluding that officers must either quickly issue a ticket or immediately place suspect under custodial arrest).

With all of this in mind, Molina's complaint can be read to allege four independent Fourth Amendment violations: (1) David lacked reasonable suspicion to seize Molina by initiating a traffic stop; (2) David unnecessarily prolonged the stop to gather evidence of unrelated offenses; (3) David lacked probable cause to initiate a full-blown arrest; and (4) Molina's arrest and detention were conducted in an extraordinary manner, with unreasonable delays. These possible theories are addressed in turn.

First, Molina has not adequately alleged that David lacked reasonable suspicion to pull her over. Probable cause and reasonable suspicion exist separate from motive; a police officer may therefore engage in a pretextual traffic stop if the officer has seen a traffic violation. *Whren*, 517 U.S. at 812–13, 818. Here, the Court cannot infer—even viewing the complaint in the light most favorable to Molina—that David did not have probable cause (or the lesser included justification of reasonable suspicion). Molina claims that she was pulled over "for a minor traffic violation" and she was charged with "driving under the influence of alcohol and other minor traffic offenses." [*Id.*, ¶¶ 46, 202.] Molina makes several allegations from which the Court can infer that David lacked probable cause to arrest for *driving under the influence*, including that she "did not show any signs of alcohol consumption" and that the driving under the influence charges were later dropped. [*Id.*, ¶¶ 89, 152.] But she does not make similar claims about the "other minor traffic offenses." In other words, Molina does not allege facts from which the Court can infer that she did not commit these minor infractions (let alone that David did not reasonably suspect she had).

Second, Molina has adequately pled that she was unreasonably seized during the twenty-minute conversation she had with David. As explained in *Rodriguez*, an arresting officer (even if

15

he has probable cause) may not deliberately prolong a traffic stop in order to gather evidence of another crime. *Rodriguez*, 135 S. Ct. at 1612. The officer must issue a citation and get on his way, per *Rodriguez*, or take the driver into custody, per *Atwater*. See *id.* at 1622 (Thomas, J., dissenting). David did neither. Instead, viewing the complaint in the light most favorable to Molina, Davis attempted to gather evidence of her supposed intoxication—that is, another offense for which he did not have probable cause to arrest her. David was not constitutionally permitted to extend the stop beyond what was necessary to either write a ticket or effectuate a custodial arrest, and therefore is liable for the unconstitutional seizure. See *Martin*, 934 F.3d at 606 (allowing recovery under § 1983 for elongation of stop—but damages were limited to the duration of the stop).

Third, for the reasons discussed above, Molina has not adequately demonstrated that David lacked probable cause to arrest her for the non-driving-under-the-influence traffic violations.

Fourth, Molina has adequately pled that the six-hour ordeal constituted a "delay deliberately created so that the process becomes the punishment." See *Portis*, 613 F.3d at 705. As the Seventh Circuit has explained, a delay of "four hours requires explanation" and such allegation should not be dismissed out of hand. *Gramenos*, 797 F.2d at 432.[10] Moreover, Molina was subject to extraordinary treatment, designed to exacerbate whatever baseline humiliation arrestees feel. See *Atwater*, 532 U.S. at 355; cf. also *Lauro v. Charles*, 219 F.3d 202, 211–13 (2d Cir. 2000)

---

[10] Admittedly, most of the recent cases to examine this standard have found officers' delays to be justifiable, but they did so at *summary judgment*, not at the motion to dismiss stage. See, *e.g.*, *Chortek*, 356 F.3d at 740 (affirming summary judgment when police explained that delay in booking was because of administrative backlog at booking facility); *Arlotta v. Bradley Center*, 349 F.3d 517, 523 (7th Cir. 2003) (affirming summary judgment when police explained that delay in booking was to allow police to round up remaining suspects); *Shelby Indus. Park, Inc. v. City of Shelbyville*, 2008 WL 2018185, *12–13 (S.D. Ind. May 9, 2008) (granting summary judgment in light of uncontested police justifications for delaying search); see also *Portis*, 613 F.3d at 704–05 (explaining that the *Gramenos-Chortek* framework should be applied in a case-by-case basis in light of "the reasons why release was deferred").

(holding that delaying detention so defendant would undergo a public "perp walk" was an unreasonable seizure). According to Molina, David spent *six hours* mocking her, during which time David pretended to let her go, demeaned her to her boyfriend, and made her watch embarrassing videos of herself. This treatment is far beyond the standard process of arresting and booking a suspect. The Court must infer that the delay was not only needless, but was also intended to subject Molina to extrajudicial punishment in violation of the Fourth Amendment. *Portis*, 613 F.3d at 705; see also *Gramenos*, 797 F.2d at 436 (citing Malcolm M. Feeley, *The Process is the Punishment* (1979)).

### 2. Latronico's liability[11]

Section 1983 plaintiffs "must show that the defendants were personally responsible for the deprivation of their rights." *Wilson v. Warren County, Illinois*, 830 F.3d 464, 469 (7th Cir. 2016). "A defendant is personally responsible 'if the conduct causing the constitutional deprivation occurs at his direction or with his knowledge and consent.'" *Id.* (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). "In short, some causal connection or affirmative link between the action complained about and the official sued is necessary for § 1983 recovery." *Gentry*, 65 F.3d at 561. Plaintiffs must allege more than mere negligence—they must show that the defendant knew that the primary actor "was acting wrongfully and facilitated it, approved it, condoned it, or turned a blind eye." *Pepper v. Village of Oak Park*, 430 F.3d 805, 811 (7th Cir. 2005) (cleaned up).

Molina has alleged sufficient facts from which the Court can infer that she is plausibly entitled to relief from Latronico, even though he was not present throughout the arrest. The Court can infer based on Molina's allegations that Latronico told David of Molina's location and sent

---

[11] Latronico's personal liability under § 1983 is distinct from liability for civil conspiracy under federal law. See, *e.g.*, *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988) (listing elements of federal civil conspiracy). As explained above, *supra* Section III(B), Molina has not adequately alleged a federal civil conspiracy.

him to her [¶¶ 41–43]; encouraged David to unnecessarily detain Molina [¶¶ 58–61, 64–65]; encouraged David to conduct the unnecessary FST [¶ 66]; encouraged David to indefinitely detain her pending her acquiescence to the breathalyzer test [¶¶ 67, 82]; and supported David during his hours-long delay in booking Molina [¶¶ 104, 111, 113–114].  Latronico's text message to David, informing him of Molina's whereabouts, coupled with his continuous inspiration and help, clearly provides a "causal connection or affirmative link" between his actions and the underlying constitutional violation—David would not have been waiting outside of the Blue Light had Latronico never tipped him off.  See *Gentry*, 65 F.3d at 561.  Moreover, Molina has alleged sufficient facts from which the Court can infer that Latronico "facilitated," "approved," "condoned," or "turned a blind eye" to David's behavior throughout the night—indeed, he was well aware of David's actions at each step of the way and presumably egged David on.[12]  *Pepper*, 430 F.3d at 811.  That is enough to state a claim for relief against Latronico under § 1983.

### D.      State law claims

Because the Court has concluded that Molina has stated a claim pursuant to § 1983, the Court may exercise supplemental jurisdiction over the other state-law claims stemming from her arrest.  See 28 U.S.C. § 1367(a).  The Court first determines whether supplemental jurisdiction is appropriate and then examines the surviving state law claims.  For each of the state law claims that survive the Eleventh Amendment analysis, the Court applies Illinois law.[13]  Importantly, the state

---

[12] Latronico points to a handful of conclusory allegations in Molina's complaint to show that she has not adequately pled sufficient factual information illustrating that Defendants conspired.  See [28 at 9 (quoting [24, ¶192])].  Even if that allegation is conclusory, she has adequately pled that Latronico and David were in communication throughout the night and that the two consulted on multiple occasions.  Taking those allegations as true, the Court can infer that Latronico was in league with David, and therefore he is at least plausibly liable under § 1983.  See *Pepper*, 430 F.3d at 811.

[13] "A federal court exercising supplemental jurisdiction over state-law claims * * * applies the choice-of-law rules of the forum state."  *Vendavo Inc. v. Long*, ___ F. Supp. 3d ___, 2019 WL 4139000, *4 (N.D. Ill. August 30, 2019) (citing *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014)).  The

law torts discussed below are not necessarily coterminous with the Fourth Amendment theories discussed above in Section III(C).  See, *e.g.*, *Baker*, 443 U.S. at 142.

### 1. Supplemental Jurisdiction

When a district court has original jurisdiction over one claim, it may exercise supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United State Constitution."  28 U.S.C. § 1367(a).  Such claims are sufficiently related if they "derive from a common nucleus of operative facts."  *Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir.1995) (citations omitted).  The phrase is somewhat amorphous, but "[a] loose factual connection between the claims is generally sufficient." *Sanchez & Daniels v. Koresko*, 503 F.3d 610, 614 (7th Cir. 2007).  Here, the state law claims all have (at least) a "loose factual connection" to the underlying § 1983 claim for unlawful seizure—they are all related to the circumstances leading up to, facts of, and immediate aftermath of Molina's arrest on September 30, 2016.  Accordingly, the Court will exercise supplemental jurisdiction over the state law tort claims pursuant to 28 U.S.C. § 1367.

### 2. Count V (False Imprisonment)

"The elements of a cause of action for false imprisonment are that the plaintiff was restrained or arrested by the defendant, and the defendant acted without reasonable grounds to believe that an offense was committed by the plaintiff."  *Poris v. Lake Holiday Property Owners Ass'n*, 983 N.E.2d 993, 1007 (Ill. 2013) (citation omitted).  "Probable cause is an absolute bar to

---

parties have not briefed the choice-of-law issue, but the Court is confident that a tort committed in Illinois by two state employees acting under color of state law against another Illinois resident (who is also a public employee) is governed by Illinois law under Illinois choice-of-law rules.  See *Townsend v. Sears, Roebuck and Co.*, 227 Ill.2d 147, 161–167 (2007) (explaining that in tort actions, the law of the state of injury presumptively applies unless another state has a more significant relationship).

a claim of false imprisonment." *Hawkins v. Mitchell*, 756 F.3d 983, 994 (7th Cir. 2014) (quoting *Poris*, 983 N.E.2d at 1007).

Here, Molina argues that David did not have reasonable grounds to believe that she committed an offense—that is, he did not have probable cause. David counters that he *did* have probable cause to arrest her for the minor traffic violations. As explained above, the complaint effectively concedes that David had probable cause to arrest Molina for the minor traffic violations. See *supra* Section III(C)(1). In other words, the state-law tort of false imprisonment is not coterminous with the Fourth Amendment; although the method of David's arrest was plausibly unreasonable, he could legally arrest her for the minor traffic violation. *Atwater*, 532 U.S. at 354.

### 3. Count VI (Civil Conspiracy)

"Illinois civil conspiracy law simply 'extend[s] liability for a tortious act beyond the active tortfeasor to individuals who have not acted but have only planned, assisted, or encouraged the act.' " *Wheeler v. Piazza*, 364 F. Supp. 3d 870, 887 (N.D. Ill. 2019) (quoting *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill.2d 102, 133 (1999)). Under Illinois law, "[c]ivil conspiracy is defined as a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means." *McClure*, 188 Ill.2d at 133 (quotation marks and citation omitted). "A plaintiff must allege facts establishing both (1) an agreement to accomplish such a goal and (2) a tortious act committed in furtherance of that agreement." *Independent Trust Corp. v. Stewart Information Services Corp.*, 665 F.3d 930, 939 (7th Cir. 2012) (citing *McClure*, 188 Ill.2d at 133). For a defendant to be liable, he "must have 'under[stood] the general objectives of the conspiratorial scheme, accept[ed] them, and agree[d], either explicitly or implicitly to do [his] part to further those objectives.' " *Id.* (quoting *Adcock v. Brakegate, Ltd.*, 164 Ill.2d 54, 64 (1994)) (alterations in original). In his motion to dismiss, David

rehashes his arguments regarding the reasonableness of his seizure to argue that there was no unlawful or tortious act. [26 at 11.] Latronico ventures that he cannot be liable because he did not commit any overt acts *himself*.[14] [28 at 9.]

Molina has adequately pled a plausible claim for civil conspiracy. As explained below, David's conduct gave rise to several plausible claims under state tort law. Molina has also adequately pled an explicit or implicit agreement between the two troopers, see *Stewart Information Services*, 665 F.3d at 939: David and Latronico consulted all night long via text message, Snapchat, and phone about how to proceed with Molina's arrest. The Court can infer that Latronico "understood the general objective" of immiserating Molina by detaining her for six hours before bringing her into custody and "agreed" to "do his part to further those objectives" by providing guidance to David and loudly mocking Molina. Finally, Latronico need not to commit an overt act himself to be liable. *Wheeler*, 364 F. Supp. 3d at 887. As explained at length above, David committed several overt acts in furtherance of the conspiracy, including locking Molina up for six hours in the back of his car while mocking her—because Latronico plausibly agreed to be part of the conspiracy, David's torts are attributable to him.[15]

### 4. Count VII (Malicious Prosecution)

"In order to establish a malicious prosecution action, the plaintiff must allege facts showing: (1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of

---

[14] Latronico also raised the intracorporate conspiracy doctrine in the motion to dismiss, but acknowledges in reply that it is inapplicable to this case. [35 at 5.]

[15] Molina has adequately alleged sufficient facts from which the Court can include that Latronico agreed to participate in the conspiracy to the extent that David committed any actionable tort against Molina. Thus, the Court will not needlessly rehash every fact giving rise to civil conspiracy in each subsection in which it finds that Molina has adequately alleged a tort against David.

probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Swick v. Liautaud*, 169 Ill.2d 504, 512 (1996) (quotation marks and citation omitted). Not all dismissals are favorable: "a criminal proceeding has been terminated in favor of the accused when a prosecutor formally abandons the proceeding via a *nolle prosequi*, unless the abandonment is for reasons not indicative of the innocence of the accused." *Id.* at 513 (citations omitted).

The sticking point here is whether Molina has adequately alleged a favorable outcome. Based on the complaint, the Court can infer that she is plausibly entitled to relief for malicious prosecution on the driving under the influence count: Molina alleged that during the stop and subsequent arrest, she "did not show any signs of alcohol consumption." [24, ¶ 89]. The Court infers that she passed the FST and breathalyzer tests, as failure of those would obviously constitute "signs of alcohol consumption." See [*Id.*, ¶¶ 68, 90, 89]. Accordingly, the dismissal for driving under the influence was not inconsistent with Molina's innocence. Molina has adequately pled facts supporting the other elements—(1) she was charged with driving under the influence [¶ 151][16]; (3) the police lacked probable cause that she had driven under the influence [¶ 89]; (4) Defendants acted with malice [¶¶ 60–67, 73, 75–77, 84, 104–114, 133–134]; and (5) that she was injured [¶¶ 153, 205]—so the malicious prosecution claim survives the motion to dismiss.

### 5. Counts VIII (Unlawful Detention) & IV (Unlawful Seizure)

Given that "[d]istrict judges have no obligation to act as counsel or paralegal to *pro se* litigants," the Court could hardly be expected to do same on behalf of represented clients. See

---

[16] Latronico claims that he cannot be held liable for malicious prosecution because he did not personally charge Molina, but he does not cite any authority on this question. See [28 at 10]. Illinois law contemplates that malicious prosecution claims can be brought against parties other than the arresting officer. Those whose actions provoke a malicious prosecution are liable as well, so long as the other elements are met. See *Swick*, 169 Ill.2d at 508–09, 512 (entertaining malicious prosecution claim against parties that instigated a police investigation). For the reasons stated above, Latronico is therefore a proper defendant. In any event, he would be liable as a civil co-conspirator. See *supra* Section III(D)(3).

*Piller v. Ford*, 542 U.S. 225, 231 (2004). Here, Molina brings claims under the purported Illinois state causes of action for "Unlawful Detention" and "Unlawful Seizure." Defendants moved to dismiss. In defense of these claims, Molina simply refers to her discussion of the Fourth Amendment constitutional issues, which may or may not be coterminous with state tort law. *Baker*, 443 U.S. at 142. She does not cite to any case or statute that grants the sought-after relief to victims of these purported causes of action. Indeed, after a cursory review of Illinois cases, the Court is unclear whether these independent causes of action exist.[17] Accordingly, Molina has failed to demonstrate that she is entitled to relief on these counts. With that said, the Court will consider a motion to amend the complaint or a motion for reconsideration that elucidates the legal bases for these claims.

### 6. Count X (Intentional Infliction of Emotional Distress)

"In order for a plaintiff to prevail under Illinois law in a tort action for intentional infliction of emotional distress, she must demonstrate that: (1) the defendant's conduct was extreme and outrageous, (2) the defendant either intended that his conduct would inflict severe emotional distress, or knew there was a high probability that his conduct would cause severe emotional distress, and (3) the defendant's conduct in fact caused severe emotional distress." *Zoretic v. Darge*, 832 F.3d 639, 645 (7th Cir. 2016) (citing *Doe v. Calumet City*, 161 Ill.2d 374, 391 (1994)). In analyzing the first element Illinois courts consider, *inter alia*, "the degree of power or authority which a defendant has over a plaintiff"; "whether the defendant reasonably believed that his objective was legitimate"; and "whether the plaintiff is particularly susceptible to emotional

---

[17] For example, the few tort cases that discuss "unlawful detention" use it synonymously with "false imprisonment." See, *e.g.*, *Morse v. Nelson*, 48 Ill. App. 3d 895, 899 (5th Dist. 1977) ("False imprisonment consists of an Unlawful detention, confinement or restraint."). And "unlawful seizure" claims under Illinois law appear to primarily concern the conversion of property. See, *e.g.*, *Martin v. McIntosh*, 37 Ill.App.3d 526, 527 (5th Dist. 1976).

distress." *Honaker v. Smith*, 256 F.3d 477, 491–92 (7th Cir. 2001) (collecting cases). The second element is satisfied when the defendant's actions "by their very nature[] were likely to cause severe distress or when the defendant knew that a plaintiff was particularly susceptible to such distress." *Id.* at 494. Finally, to satisfy the third element "[t]he emotional distress must be *severe*. * * * "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity." *Welsh v. Commonwealth Edison Co.*, 306 Ill.App.3d 148, 155 (1st Dist. 1999) (quoting *Public Finance Corp. v. Davis*, 66 Ill.2d 85, 90 (1976)). "Garden-variety emotional distress is insufficient to meet that standard." *McGreal v. Village of Orland Park*, 850 F.3d 308, 314 (7th Cir. 2017). But, "the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed." *Calumet City*, 161 Ill.2d at 396 (quoting Restatement (Second) of Torts § 46, Comment j, at 78 (1965)).

Molina has adequately pled facts from which the Court can infer that all three elements are met. First, David's conduct, as alleged in the complaint, was extreme and outrageous. As a state trooper, David had absolute power and authority over Molina—and used that authority to keep her handcuffed in the back of his car for six hours. While so doing, he continuously taunted her and showed her embarrassing videos of herself. On the facts alleged, David could not have possibly believed that there was a legitimate end to his actions—indeed, he turned off the dashcam, suggesting that he knew his actions were extreme and outrageous. In short, "an average member of the community" would exclaim "'Outrageous!'" upon hearing these facts. See *Calumet City*, 161 Ill.2d at 392 (quoting Restatement (Second) of Torts § 46, Comment d, at 73 (1965)). Second, David's actions—locking someone in the police cruiser, driving her around the city for six hours, pretending to let her go, and taunting her all the while—are likely to cause severe distress. Indeed,

they seemed deliberately designed to have that effect, and the fact that David turned off his dashcam buttresses this conclusion. Moreover, based on the facts pled in the complaint David plausibly knew that Molina was "particularly susceptible to such distress" given that she apparently responded so poorly to a much briefer detention in January 2016.

Third, Molina has adequately pled that she plausibly suffered *severe* distress. Given the implication that Molina had a distressed reaction during the January 2016 stop, the Court can infer that she endured significant distress when actively mocked and detained for hours on end. See [24, ¶¶ 47, 53, 84, 105–109 (alleging that David remembered the stop and that being shown footage of her January detention was humiliating)]. The duration of the September 2016 detention—six hours (exclusive of any distressed experienced following booking)—also weighs on the side of finding severe distress. For at least some of that time, Molina was in tears. [*Id.*, ¶ 107, 111, 113.] She elaborates that she suffered "emotional trauma" following the ordeal that required treatment. [*Id.*, ¶ 153.] Finally, David's conversation with Molina's boyfriend regarding whether Molina should be dropped off can be read as indicative of her severely distressed emotional state; perhaps the reason David was apprehensive of dropping her off was because she was obviously in emotional shambles. See [*id.*, ¶¶ 125, 127–30]. Viewing these facts in light of the extreme and outrageous character of David's conduct, the Court concludes that Molina has plausibly suffered severe distress. See *Calumet City*, 161 Ill.3d at 396.

As explained above, Molina has adequately demonstrated that Latronico can be liable for the actions of the principal (here, David) under Illinois civil conspiracy. See *supra* Section III(D)(3).

### 7. **Count XI (Intrusion upon Seclusion)**

"The elements to state a claim for intrusion upon seclusion are: (1) an unauthorized intrusion or prying into a plaintiff's seclusion; (2) the intrusion would be highly offensive or objectionable to a reasonable person; (3) the matters upon which the intrusion occurred were private; and (4) the intrusion caused anguish and suffering." *Vega v. Chicago Park Dist.*, 958 F. Supp. 2d 943, 959 (N.D. Ill. 2013) (quoting *Busse v. Motorola, Inc.*, 351 Ill.App.3d 67, 286 Ill.Dec. 320, 813 N.E.2d 1013, 1017 (2004)). "[T]he core of intrusion upon seclusion is the offensive prying into the private domain of another." *Id.* (citing *Lovgren v. Citizens First Nat. Bank of Princeton*, 126 Ill.2d 411, 417 (1989)) (cleaned up). Molina claims that the video of the 2016 arrest was private, and that retaining it and/or showing it to her (the complaint and briefing are not clear) constituted an intrusion into private matters.

This claim must be dismissed, because Molina has not adequately alleged either an intrusion or that the footage was private. First, Molina has failed to adequately allege that Defendants intruded or pried into her seclusion. The complaint and briefing are not clear, but Molina seems to argue that the intrusion was Defendants' keeping the video of the 2016 arrest past its retention period as required by the Illinois State Police Act (ISPA). 20 ILCS 2610/30(f). The problem for Molina is that the ISPA only sets a *minimum* storage period "of at least 90 days" after which time "the recording medium *may* be erased." 20 ILCS 2610/30(f) (emphasis added). In other words, the statute clearly contemplates and allows retention of videos beyond 90 days. Moreover, there was no intrusion to begin with: as Molina acknowledges elsewhere in her complaint, Illinois State Troopers are *required* to take dashcam video of people they arrest. [24, ¶ 101 (citing the ISPA).] Second, even if Defendants intruded by taking or retaining the video, she has not alleged that they pried into private matters. Quintessential intrusion upon seclusion

cases involve "peering into the windows of a private home," "opening a person's mail, searching a person's safe or wallet, and reviewing a person's banking information." *Vega*, 958 F. Supp. 2d at 959 (reviewing authorities and Illinois caselaw). In these cases, the plaintiff's "private domain" was invaded. *Id.* Plaintiff has not demonstrated any privacy interest in her presence on the public highway or the statements that she made to police. Moreover, she has not alleged that the video is private—nor will she be able to, because troopers' dashcam footage is publicly available through the Illinois Freedom of Information Act. 20 ILCS 2610/30(g). Molina's claim cannot stand.

### 8. Count XII (Respondeat Superior)

This count is only brought against Defendants in their official capacities and is therefore dismissed pursuant to the Eleventh Amendment. *Pennhurst*, 465 U.S. at 100; see also *supra* Section III(A). Because the Court cannot issue an order for money damages against the State of Illinois, Defendants' employer, this count is dismissed with prejudice. *Id.*

### 9. Count XIII (Indemnification)

Finally, Defendants seek the dismissal of Plaintiff's indemnification claim, arguing that the Eleventh Amendment forbids such a claim. "[T]he Eleventh Amendment forbids a federal court from ordering state officials to conform their conduct to state law." *Benning v. Bd. of Regents of Regency Univs.*, 928 F.2d 775, 779 (7th Cir. 1991). However, a "state's decision to indemnify its employees does not transform a suit against individual defendants into a suit against the sovereign." *Id.* Here, Count XIII does not even list the State as a defendant or describe what relief is sought beyond damages from the named Defendants. See [24, ¶¶248-50]; [33 at 5–6]. The Court has already reviewed indemnification claims such as this in similar cases and concluded that they should be dismissed. *Wheeler*, 364 F. Supp. 3d at 887 (dismissing indemnification count because it was "a mere legal conclusion that does not * * * purport to make a substantive claim"

and federal courts "cannot enter a monetary judgment that requires the State of Illinois to indemnify its employees") (internal quotation marks and citations omitted); *see also Ollison v. Wexford Health Sources, Inc.*, 2016 WL 6962841, *9 (N.D. Ill. Nov. 29, 2016) (dismissing a similar count along similar lines). Accordingly, Molina's indemnification count is dismissed with prejudice.

## IV. Conclusion

For the reasons state above Defendant David's [25] and Defendant Latrino's [27] respective motions to dismiss are granted in part and denied in part. This case is set for further status hearing on January 15, 2020 at 9:00 a.m.

Dated: December 27, 2019

_____
Robert M. Dow, Jr.
United States District Judge