IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
ILLINOIS EASTERN DIVISION

| | |
|---|---|
| MICHELE MOLINA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> GLENN LATRONICO, *et al.*, ) <br> ) <br> Defendants. ) | Case No.: 18-cv-06632 <br><br> Hon. Robert M. Dow, Jr. |

**PLAINTIFF MICHELE MOLINA'S
LOCAL RULE 56.1 STATEMENT OF ADDITIONAL MATERIAL FACTS IN
RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff, MICHELE MOLINA, by her attorneys, TOMASIK KOTIN KASSERMAN, LLC, and her for Local Rule 56.1 Statement of Additional Material Facts, in Response to Defendants' Motions for Summary Judgment, states as follows:

**PLAINTIFF'S EXHIBIT LIST**

1. Plaintiff's Second Amended Complaint

2. Deposition Transcript of Sergeant Susana Matias

3. Deposition Transcript of Special Agent Andrew Aguilar

4. Illinois State Police Directive, EQP-015, In-Car Video Camera Recording Equipment

5. Photo of Michele Molina

6. Deposition Transcript of Ronald E. Henson, Ph.D.

7. Expert Report of Ronald E. Henson, Ph.D.

8. Illinois State Police Directive, ENF-018, Driving Under the Influence Enforcement and Processing

9. Illinois State Police Directive, ENF-014, Prisoner Transportation, Handling, Searching and Jailing

10. Illinois State Police Academy, Cadet/Recruit Training, Rights of the Accused

11. PDMC Messaging Report of Trooper Eric David

12. PDMS Messaging Report of Sergeant Susana Matias

13. Affidavit of Laura Morask

14. Cook County Ticket #9208567 Charge and Disposition

15. Photos of Trooper Glenn Latronico

16. I-Case Supplementary Report, ISP Latronico 000880-000882

17. I-Case Supplementary Report, ISP Latronico 000947-000976

18. David's Answers to Interrogatories

19. 2015 Top Cop Comprehensive Statistics

## MATERIAL FACTS

**Michele Molina meets Glenn Latronico**

1. After meeting Plaintiff Michele Molina ("Michele") in August 2015, Illinois State Police ("ISP") Trooper Glenn Latronico ("Trooper Latronico" or "Latronico") initiated text conversations with her every couple of days, and he frequently complimented Michele on how pretty she was and told her wanted to take her to dinner. (Defendants' Exhibit ("Defs' Ex.") 2, Michele Dep. V. I, at 16:3-4; 18: 4-10.)

2. The first time Michele saw Trooper Latronico after their initial meeting was when Trooper Latronico reached out to ask her what she was doing at the time while she was out to dinner with friends, and he asked her if he could stop by; however, when Trooper Latronico arrived at the restaurant, he did not enter the restaurant but instead asked Michele to come outside because he told her he "just wanted to see" her. (Defs' Ex. 2, Michele Dep V. I, at 19:17-20:10.)

3. The second time Michele saw Trooper Latronico after their initial meeting was when Trooper Latronico, who was actually on duty at the time, asked her to meet him in an empty

2

lot, and both of them remained in their respective cars while they spoke for approximately ten minutes. (Defs' Ex. 2, Michele Dep V. I, at 21:6-11.)

4. Trooper Latronico sent several photos of himself to Michele via text message, including depicting the following: one of himself in a red shirt and vest in a bathroom; one of himself in shorts and an open hooded sweatshirt in a bathroom; one of himself seemingly in the nude of his upper body in a bathroom; one of himself in his Illinois State Police vehicle while dressed in uniform; and one of himself in his Illinois State Police displaying his erect penis. (Pltf's Ex. 15, Photos of Trooper Latronico; Defs' Ex. 2, Michele Dep V. I, at 150:14-21; 151:22-152:2; 157:6-17.)

5. Sergeant Matias testified that it is unacceptable for an Illinois State Police Officer to take a photograph of himself exposing his penis while in uniform in a marked squad car. Pltf's Ex. 2, Matias Dep., at 47:20-48:5.)

6. A few months after they met, Trooper Latronico told Michele he was married and had been for a long time, but that he was not in love with his wife and that he and his wife were in an open relationship, to which Michele responded by telling Trooper Latronico that she was no longer interested in communicating with him, which upset him. (Defs' Ex. 2, Michele Dep. V. II, 163:3-4.)

7. In September 2016, after many months of no contact, Trooper Latronico texted Michele on three occasions, requesting her address so that he could sleep on her couch, and Michele declined to give it to him each time until she finally stopped responding to Latronico's text messages. (Defs' Ex. 3, Michele Dep. V. II, at 79:23-80:4, 241:13-242:19; 261:7-262:12.)

8. Trooper Latronico then messaged Michele on Snapchat by writing "Hello" and asked her twice more if she was going to let him sleep on her couch, utilizing capitalized letters and exclamation points in his messages. (Defs' Ex. 3, Michele Dep. V. II, at 262:17-24.)

9. Michele believed Trooper Latronico was angry that she had declined to give him her address based on his reaction, and that was the last time Michele communicated with Trooper Latronico before she was pulled over by Trooper Eric David ("Trooper David" or "David") in the early morning on September 30, 2016. (Defs' Ex. 3, Michele Dep V. II, at 79:21-80:12.)

**January 31, 2016: Michele Molina encounters Trooper Eric David**

10. When Trooper Eric David pulled her over on January 31, 2016, Michele called Trooper Latronico from her cell phone and informed him she was with Trooper David, but when Trooper Latronico wanted to speak on the phone with Trooper David, he refused to speak with Trooper Latronico on Michele's phone. (Defs' Ex. 8, January Video, at 5:05.)

11. Trooper David returned to his squad car and answered a phone call from Trooper Latronico, who asked Trooper David, "What're you doing to her?" and Trooper David responded to Trooper Latronico, "Your fucking friend's a piece of shit, dude." (Defs' Ex. 8, January Video, at 7:40, 7:47.)

12. Trooper Latronico said to Trooper David, "Tell her to put me in her fucking asshole…Tell her to thank me properly later…Tell her she better be on her hands and knees later." (Defs' Ex. 8, January Video, at 8:19, 9:06, 9:57.)

13. Trooper David stated to Trooper Latronico, "I'm going to make her blow in the PBT too just for giggles," and told Trooper Latronico that he would send "it" to him. (Defs' Ex. 8, January Video, at 9:32.)

14. When Trooper David reapproached Michele's vehicle, he did not give her a ticket or arrest her, but instead told her, "If I were you, I would take your tone and change it. We're saving you your job." (Pltf's Ex. 8, January Video, at 9:57.)

**Illinois State Police District**

15. Illinois State Police District Chicago is broken up into three separate sectors: the North sector comprises of I-94, which is the Edens Expressway, I-90, which is the Kennedy Expressway that extends out towards the airport and meets up with the Tollway, all the way down to the downtown area, the circle interchange; the Middle sector comprises of I-290 out to DuPage County and to downtown, and I-55 from downtown out to the County Line Road, which meets DuPage County as well; and the South sector is comprised of the Dan Ryan, I-57, I-94, which is the Bishop Ford Expressway, a portion of I-80 which is part of Cook County up to the Indiana state line, and I-394, which meets up to Will County, which is Steger Road. (Pltf's Ex. 3, Aguilar Dep., at 13:9-14:3); Defs' Ex. 16, Jimenez Dep., at 10:10-11:8.)

16. In September of 2016, Trooper David was assigned to the south sector midnight shift, and Sergeant George Jimenez was Trooper David's supervisor and master sergeant. (Pltf's Ex. 3, Aguilar Dep., at 15:15-16; Defs' Ex. 16, Jimenez Dep., at 25:9-18.)

17. ISP Troopers are permitted one hour of personal time during which they can leave their assigned zone; however, ISP troopers should inform their supervisor over the radio when they are taking their personal time and always be able to respond to calls in their sector. (Defs' Ex. 6, Latronico Dep., at 39:19-22; Defs' Ex. 7, David Dep., at 103:15-105:1.)

18. ISP troopers are to remain in their zones unless they are needed elsewhere, and there are numerous other troopers assigned to the other ISP zones. (Pltf's Ex. 3, Aguilar Dep, at 14:5-17; Pltf's Ex. 2, Matias Dep., at 24:18-21.)

5

**Illinois State Police Directives**

19. ENF-018, Driving Under the Influence Enforcement and Proceeding, is the Illinois State Police Directive that provides the procedure for driver submission to Preliminary Breath Tests (PBT), and instructs that an ISP "officer will complete the Warning to Motorist form, provide a copy to the driver, and read the Warning to Motorist to driver," as well as the following subsequent steps that are to be taken after that occurs:

> Section III.E.1. requires that "once a refusal to submit has been communicated to the arresting officer, the officer will immediately complete the appropriate portion of the report." (Illinois State Police Directive, ENF-018, Driving Under the Influence Enforcement and Proceeding.) That was not done here, as Michele did not refuse.
>
> Section III.E.2. requires that once "the driver agrees to submit to and completes the chemical test(s) requested, the arresting officer will complete the appropriate portion of the test(s) disclose:
>
>> III.E.2.a. An alcohol concentration of .08 or more."

(Pltf's Ex. 8, Illinois State Police Directive, ENF-018, Driving Under the Influence Enforcement and Proceeding.)

20. EQP-015, In-Car Video Camera Recording Equipment, is the Illinois State Police Directive that provides the procedure for the use of in-car video camera recording equipment in patrol vehicles and requires the following:

> V.B.1. Officers in uniform will video and audio record every enforcement stop as defined in paragraph III.A. This includes criminal violations discovered as a result of the stop.
>
> ….
>
> V.B.4. The recording will not be interrupted or stopped until completion of the enforcement stop. The enforcement stop is considered complete when the subject of the enforcement stop or the office has left the scene. In cases where the officer is transporting a subject, the stop is considered complete upon arrival at the destination.
>
> ….
>
> V.B.10. Officers will video and audio record activities inside the vehicle when transporting an arrestee.
>
> ….

6

      V.E.3.      Except for evidentiary purposes, reproduction of video medium recorded by district personnel is prohibited unless authorized by the District Commander or designee.

(Pltf's Ex. 4, Illinois State Police Directive, EQP-015, In-Car Video Camera Recording Equipment.)

      21.      ISP officers conducting a DUI arrest are required, pursuant to ISP directive, to keep the in-car video camera on at all times while the offender is being questioned and while the offender is in the backseat of a squad car, and to bring an offender to the nearest police station without any delay. (Pltf's Ex. 2, Matias Dep., at 20:22-21:4.)

      22.      Trooper David did not activate his video and audio camera when he left the 1st District to take Michele to the 16th District. (Defs' Ex. 28, Eric David, Illinois State Police I-Case Supplementary Report, p. 202.)

      23.      Trooper Aguilar testified that it is important for Illinois State Police to keep their video and audio on at all times during a DUI arrest to maintain evidence of what is happening and what someone might be saying, and the failure to keep both on is a violation of Illinois State Police rules and regulations to turn off the video or audio at any time during a DUI arrest. (Pltf's Ex. 3, Aguilar Dep., at 30:16-31:7.)

**Trooper David and Trooper Latronico**

      24.      In 2015 alone, Trooper David made 310 driving under the influence ("DUI") arrests, which was double the number of DUI arrests the Illinois State Police officer with the next highest number of DUI arrests in Illinois that year. (Pltf's Ex. 19, See 2015 Top Cop Comprehensive Statistics.)

      25.      Trooper David made approximately 884 DUI arrests from June 1, 2016, until the time he signed the Verification page of his Answers to Interrogatories on December 1, 2020, and

7

by the time of service of his Answers to Interrogatories, Trooper David has received five MADD Hero Awards and five Alliance Against Intoxicated Motorists Top Cop Awards. (Pltf's Ex. 19, David's Answers to Interrogatories, p. 8.)

26. In 2016, Trooper David and Trooper Latronico were good friends, and Trooper David in fact their friendship at that time as a 6 or 7 out of 10 (10 being best friends and 0 being strangers). (Defs' Ex. 7, David Dep., at 62:16-20.)

27. Trooper David attended Latronico's wedding in November 2016, had met Trooper Latronico's parents on "several instances" prior to 2016, and even knew the names and approximate ages of Trooper Latronico's four children. (Defs' Ex. 7, David Dep., 62:23-24; 64:8-65:24; 66:19-22.)

**September 30, 2016, Traffic Stop**

28. On September 30, 2016, Trooper David had numerous social media platforms on his cell phone in 2016, including Facebook, Instagram, Snapchat, and Twitter, and is aware that Snapchat is a "video sharing application where you can take a picture and send it to someone else's device and it disappears after a certain period of time or it sends a video." (Defs' Ex. 7, David Dep., 31:7-19.)

29. Trooper Latronico had various social media platforms on his cell phone in 2016, including Snapchat and is aware that "everything disappears." (Defs' Ex. 6, Latronico Dep., 59:4-9.)

30. Illinois State Police Officers have the 10-21 app, which is an application run by the Illinois State Police, that allows ISP officers to dial on the app as if they are using a regular phone number but an ISP trooper's typical cell phone number does not appear when they use the 10-21 app. (Pltf's Ex. 2, Matias Dep., at 40:6-41:5.)

8

31. On September 30, 2016, Michele took a photo of the outside sign for the Blue Light, which she posted to her Snapchat application for her Snapchat contacts to view, and Trooper Latronico was the first of Michele's snapchat friends to view her Snapchat "story" of the photo of the Blue Light. (Defs' Ex. 3, Michele Dep. V. II, at 182:13-22; Defs' Ex. 9, Plaintiff's Snapchat Post, Michele Production 00084.)

32. Michele received a Snapchat notification on her phone that Trooper Latronico had taken a screenshot of the photo she posted to her Snapchat "story" of the Blue Light, and Trooper Latronico in fact admits to having seen her Snapchats on that evening and to taking a screenshot of her Snapchat story. (Defs Ex. 9, Plaintiff's Snapchat Post, Molina Production 00084; Defs' Ex. 3, Michele Dep. V. II, at 181:10-182:4; Defs' Ex. 6, Latronico Dep., at 60:20-23.)

33. On September 30, 2016, Western Avenue was under construction, the road was not flat or paved, and there were traffic cones lining the streets and shifting the lanes on Western Avenue from Belmont to Addison because of the construction. (Defs' Ex. 7, David Dep., at 132:5-8; Defs' Ex. 2, Michele Dep V. I, at 36:13-16; Defs' Ex. 12, September Video Part I, at 0:01).

34. On September 30, 2016, Michele's then boyfriend, Chris Sloniec, ran a red light. (Defs' Ex. 12, September Video Part I, at 00:07.)

35. On September 30, 2016, Trooper Eric David pulled Michele over at Addison and Rockwell, Chicago, Cook County, Illinois, and the nearest Chicago Police Station to Addison and Western is the 16th District or the 19th District. (Defs' Ex. 2, Michele Dep. V. I, at 37:18-38:1; Defs' Ex. 7, David Dep., at 106:23-108:1; Pltf's Ex. 3, Aguilar Dep., 47:15-20; Pltf's Ex. 2, Matias Dep., at 67:1-6.)

9

36. On September 30, 2016, after identifying himself as an ISP trooper, Trooper David immediately to said to Michel Michele, "You look really familiar." (Defs' Ex. 2, Michele Dep. V. I, at 40:6-12; Defs' Ex. 12, September Video Part I, at 2:15.)

37. David said to Plaintiff's boyfriend, who approached the scene, "You probably ran through a red light. That was you in front of her right?" (Defs' Ex. 12, September Video Part I, at 05:07.)

38. At 04:56:12, Trooper David sent a message to Trooper Matias over the IWIN system, inquiring "so, remember the CPD chick that was a complete B[?]," instructed Trooper Matias to "check your snapchat," and then, beginning at 06:19:32, Trooper David sent the following series of IWIN message to Sergeant Matias:

> can you give Orta the heads up that she's CPD
> and tell him the whole story so he doesnt think im some asshole
>
> give him the whole story from last time etc
>
> and if he needs me to call him
> ill call him when I get down to 001
>
> theyre already waiting for her

(Pltf's Ex. 11, PDMC Messaging Report, 000813.) Trooper David then sent another message at 06:23:51 to Trooper Matias, which was in all capital letters:

> STRESS THE WHOLE 107/55 LAST TIME LOL
>
> THIS TIME SHE WAS JUST GOING THROUGH RED LIGHTS AND DRIVING IN BETWEEN TWO LANES

(Pltf's Ex. 11, PDMC Messaging Report, 00814.) Twenty-three minutes later, at 06:46:29, Trooper David sent a message to Matias, stating:

> ILL BE SURE TO GET THAT ON CAMERA

10

(Pltf's Ex. 11, PDMC Messaging Report, 00816.) Less than a minute later, David sent another message to Matias:

> THATS FINE
>
> THIS IS BIGGER THAN JUST STOPPIN A CPD THO
>
> THERES A BACK STORY BUT I DONT HAVE TO EXPLAIN MYSELF TO HIM

(Pltf's Ex. 11. PDMC Messaging Report, 00816.)

39. After Trooper David sent that message her on September 30, 2016, at 04:56:12, asking, "So remember the CPD chick that was a complete B?," Sergeant Matias knew the letter B to mean the word "bitch," and even though that message that Trooper David sent to Sergeant Matias did not have any other information, including a date or time, the women's name, or if she had been arrested, Sergeant Matias knew who he was talking about when she read the message because he mentioned a CPD officer he had stopped to her at some time after the January Stop. (Pltf's Ex. 2, Matias Dep., at 54:15-56:03.)

40. Sergeant Matias testified that it was inappropriate for Trooper David to refer to someone as a bitch, but never responded to ask Trooper David about why she should check her Snapchat. (Pltf's Ex. 2, Matias Dep, at 57:11-58:21.)

41. It was not until about 20 minutes into the traffic stop that Trooper David asked if she knew anyone that he may know, to which she responded that she knew Latronico, to which Trooper David responded, "My boy," and asked Michele how she knew him. (Defs' Ex. 12, September Video, Part I, at ~20:20.)

42. Trooper David actually knew well before Michele told him that night that she knew Trooper Latronico and admitted after the stop during the investigation into his conduct that he in

11

fact recognized her within seconds of seeing her on September 30, 2016. (Defs' Ex. 28, Eric David, Illinois State Police I-Case Supplementary Report, p. 187.)

43. On September 30, 2016, another ISP trooper arrived on scene in the video of the incident at 19:10, but Trooper David did not even acknowledge him until 21:50, at which time Trooper David advised the other trooper that he was going home. (Defs' Ex. 12, September Video Part I, at 19:10 – 21:50.)

44. Trooper David finally informed Michele that he had previously stopped her in the 9th District. (Defs' Ex. 2, Michele Dep. V. I., at 41:3-7.)

45. During the September 30, 2016, stop, other ISP troopers arrived on the scene to assist Trooper David, but he informed them it was his stop and to not worry about it, which seemed to confuse them because Trooper David was in a zone that he was not assigned to. (Defs' Ex. 2, Michele Dep. V. I, at 41:13-22.)

46. During the September 30, 2016, stop, Trooper David called Trooper Latronico "my boy" and told Michele, "You weren't so nice to my boy." (Def's Ex. 3, Michele Dep. V. II, at 79:15-16.)

47. When Michele exited her vehicle, Trooper David escorted her out of the view of his vehicle's dash camera. (Def s' Ex. 12, September Video Part I, at 22:15.)

48. Trooper David was aware that Michele was cold after she exited the car and stated, "I know you're a little chilly," and despite knowing that Michele was cold, Trooper David would not permit her to do the tests in her shoes. (Defs' Ex. 12, September Video Part I, at 23:57, 25:05; Defs' Ex. 7, David Dep., at 165:16-166:2.)

49. Trooper David advised Michele's then boyfriend, Chris Sloniec, "We have a video" footage of the first time he pulled Michele over, and then asked him, Do you want to see it?" (Defs' Ex. 12, September Video Part I, at 27:09.)

50. After Michele took her shoes off as instructed, Trooper David told her that they would be done in three to four minutes, and that the only reason they were doing this was because of the previous stop. (Defs' Ex. 12, September Video Part I, at 29:50.)

51. Michele requested to speak with her FOP attorney, but Trooper David refused her the opportunity to do that, even though the Illinois State Police Academy Rights of the Accused specifically instructs that "an arrestee has the right to communicate with an attorney of his choice as well as with family members." (Pltf's Ex. 11, Michele, Illinois State Police Rights of the Accused; Defs' Ex. 7, David Dep., at 176: 19-24; 178:17-23).

52. Trooper David told Michele that, because of the previous stop, he could not let her go again. (Defs' Ex. 12, September Video Part I, at 37:56.)

53. Trooper David placed handcuffs on Michele and told her that he would let her sit in the car and think about what she wanted to do, as she would not submit to a breathalyzer, but that he was "not putting anything on the radio just yet." (Defs' Ex. 12, September Video Part I, 38:42, 39:37.)

54. Michele did indeed submit to a PBT Test. (Defs' Ex. 2, Michele Dep. V. I, at 45:8; Defs' Ex. 3, Michele Dep. V. II, at 75:2-4.)

**September 30, 2016, Transport of Michele Molina from the 1st District to 16th District**

55. Michele saw Trooper David texting on his cell phone frequently. (Defs' Ex. 3, Michele Dep. V. II, at 78:20-22.)

13

56. Trooper David asked Michele if she wanted to see her "greatest hits" and played the video of the 9th District stop in January 2016, which Michele knew, because she is a CPD officer, that officers were not supposed to keep videos. (Defs' Ex. 3, Michele Dep. V. II, at 76:14-79:05.)

57. Michele cried as Trooper David, who laughed and made taunting remarks, continued playing the video, and Michele asked Trooper David to shut the video off three times before he finally did. (Defs' Ex. 3, Michele Dep. V. II, at 76:14-79:11).

58. Trooper David said to Michele, "You weren't so nice to my boy, were you?" and Michele knew Trooper David was referring to when she refused to let Trooper Latronico sleep on her couch. (Defs' Ex. 3, Michele Dep. V. II, at 79:15-80:04.)

59. Michele heard Trooper David speak on the phone to Trooper Latronico, saying, "Yeah, I got her back here. She's not so uppity now, she's even crying back here. She's a lot nicer now. You'd love this." (Defs' Ex. 3, Michele Dep. V. II, at 80:21-23.)

60. Michele recognized Trooper Latronico's voice over some device in Trooper David's ISP vehicle, because she had spoken on the phone with him several times before September 30, 2016, and some of their phone conversations lasted over an hour. (Defs' Ex. 3, Michele Dep. V. II, at 81:3-5; 149:10-13.)

61. Every time Michele asked Trooper David where he was taking her, he ignored her and refused to tell her, and she feared that Trooper David was taking her to meet Trooper Latronico. (Defs' Ex. 3, Michele Dep. V. II, at 81:6-9.)

62. By the time Trooper David had driven her to the 16th District, the sun was up, and Michele felt Trooper David had been driving for a long time and knew it should not take as long

14

as it had to travel from the 1st District to the 16th District. (Defs' Ex. 3, Michele Dep. V. II, at 82:1-4.)

63. Michele waited handcuffed in the back of the squad car for approximately twenty minutes alone, still in handcuffs, before Trooper David returned from inside the station and began to take her handcuffs off, and told her, "It's your lucky day…You can start crying now." (Defs' Ex. 3, Michele Dep. V. II, at 82:20-22.)

64. When Michele tried to go into the station to order an Uber or call someone for a ride, Trooper David refused to let her and put his hand on the door so that she could not leave, and Trooper David told her that he was taking her home and. (Defs' Ex. 3, Michele Dep. V. II, at 83:4-13.)

65. Michele was scared and felt David Trooper was playing a "sick game" with her, but she complied because she believed she had no choice but to get in the car with Trooper David even though she was no longer in custody. (Defs' Ex. 3, Michele Dep. V. II, at 83:14-19.)

66. Michele was too scared to ride with Trooper David all the way to her house on the south side of Chicago, so she gave him her boyfriend's address; however, Trooper David told Michele he was not dropping her there unless she gave him her boyfriend's number and he was able to speak to him, so she gave him two wrong numbers before finally giving him the correct number for Chris. (Defs' Ex. 3, Michele Dep. V. II, at 84:1-85:7.)

**Errors in Trooper David's Reports**

67. Trooper David wrote an Illinois State Police I-Case Original Report in this case, which he testified to having started inside the Chicago Police Department 16th District location, but then went out to his vehicle to complete; however, Trooper David did not submit his report until 22:16 that night. (Defs' Ex. 13, I-Case Original Report; David, p. 1.)

15

68. When Michele blew the Preliminary Breath Test (PBT) on September 30, 2016, she blew a .135, and Illinois State Police directives requires that, when a person who took the portable breath test blows over .08, it is mandatory for officers to include that fact in the arrest report. (Defs' Ex. 20, PBT; Pltf's Ex. 2, Matias Dep., at 47:12-17; Pltf's Exhibit 3, Aguilar Dep., at 31:15-20; Def's Ex. 16, Jimenez, 65:4-23.)

69. However, in his report, David wrote that Michele refused to do the Preliminary Breath Test (PBT), which is incorrect as she in fact did submit to a PBT, which Trooper David has admitted. (Defs' Ex. 13, I-Case Original Report; Defs' Ex. 20, Breathalyzer Test Results, Molina Production 0030.)

70. In his report, David wrote that Michele's hair color was blond or strawberry; however, Michele's hair color is brown. (Defs' Ex. 13, I-Case Original Report; David, p. 2; Pltf's Ex. 5, Photo of Michele Molina.)

71. In his report, David wrote that Michele was fingerprinted at the CPD 1st District; however, she was fingerprinted at the 16th District. (Defs' Ex. 13, I-Case Original Report, David).

72. David issued five citations to Michele, including:

   Citation #9208567 – 625 ILCS 11-501(A)2 – Driving Under the Influence of Alcohol
   Citation #9208568 – 625 ILCS 11-501(A)1 – Driving Under the Influence of Alcohol BAC over .08
   Citation #9208569 – 625 ILCS 11-709(A) – Improper Lane Us05age
   Citation #9208570 – 625 ILCS 11-3 – Disregard Official Traffic Control Device
   Citation #9208571 – 625 ILCS 3-413(F) – Expired Registration

(Defs' Ex. 13, I-Case Original Report, David, p. 3.)

73. Laura Morask, the attorney, who represented her in the criminal proceedings, met with the Assistant Cook County State's Attorney ("ASA") during the prosecution and showed him

16

the dashcam video of the traffic stop and eventual arrest of Michele. (Pltf's Ex. 13, Affidavit of Laura Morask.)

74. After viewing it, the ASA concluded that there were not reasonable grounds to pursue the prosecution, and that the Cook County State's Attorney's Office therefor could no longer pursue the prosecution of Michele for Ticket #39208567, so the *nolle prosequi* order was entered on March 30, 2017, and, because the ASA based his determination on video evidence of the traffic stop, the case was terminated in her favor for reasons consistent with innocence. (Pltf's Ex. 13, Affidavit of Laura Morask.)

**Aftermath**

75. In the report, Trooper David wrote that Michele's eyes were bloodshot; however, her eyes were white. (Pltf's Ex. 5, Photo of Michele; Defs' Ex. 6, Latronico's Dep, at 192:5-19.)

76. An Illinois State Police Department Internal Investigation was completed after an Allegation of Improper Conduct and Bringing the Department into Disrepute against ISP was made by Michele against Trooper David and Trooper Latronico, and Trooper David was interviewed on January 31, 2019, relative to that complaint, during which he stated sold a condo and was on his way there to get his mail. (Defs' Ex. 2, Eric David, Illinois State Police I-Case Supplementary Report.)

77. Trooper David was suspended for two days for failing to turn on his in-car camera when leaving the 1st District with Michele still in his ISP vehicle. (Pltf's Ex. 18, David's Answers to Interrogatories, p. 5; Def's Ex. 7, David's Dep, 85:20 – 86:7.)

**Expert Opinions**

78. Plaintiff's Expert Witness, Ronald E. Henson, Ph.D. ("Expert Henson") testified that Trooper David had Michele, who was already not wearing a coat, remove her high heel shoes,

17

and her perform a walk and turn test and one-leg stand test on Michele, during which there was rain evidenced on the video and wind evidenced on the microphone, which Expert Henson instructed the NHTSA admonishes against, because wind and weather conditions may interfere with the performance of a walk and turn and one-leg stand test. (Pltf's Ex. 7, Henson Dep., at 27:11-23.)

79. Expert Henson testified that the proper protocol for when weather is affecting tests is to advise the person she is not under arrest, but that, out of fairness, officers want to relocate her to a location to get her out of the elements to conduct the tests. (Pltf's Ex. 7, Henson Dep., at 28:14-22.)

80. Expert Henson testified that the National Highway Traffic Safety Association requires a dry surface when conducting the walk and turn and one-leg balancing test, and that, because rain and wind can impact an officer's ability to make a proper assessment of intoxication, which was the case here as there was rain, wind and cold weather evident on the video. (Pltf's Ex. 7, Henson Dep., at 28:13-31:10.)

81. Expert Henson testified that the odor of an intoxicating beverage from a vehicle or individual is an observation of virtually no scientific value to determine intoxication or impairment, and, in fact, the odor is not ethyl alcohol but rather is derived from flavoring agents and manufacturing processes generally called congeners, are different chemicals than ethyl alcohol, which different absorption, distribution and removal patterns than ethyl alcohol, and they can be present even in the absence of ethyl alcohol or in non-alcoholic beverages, that give beverages their characteristic odors, so ultimately, the odor of alcohol does not indicate the type of drink, the strength of the drink, or the amount of alcohol consumed. (Pltf's Ex. 7, Henson Dep., at 21:22-22:13)

18

82. Expert Henson testified that: glassy eyes are not associated with alcohol intoxication and are not found in the NHTSA SFST training manual; blood shot eyes are not conclusive evidence that someone has been drinking alcohol and are not a good basis to draw a conclusion that a person is alcohol impaired; and the scent of alcohol and noted bloodshot eyes together are not conclusionary for alcohol impairment. (Pltf's Ex. 7, Henson Dep., at 25:7-27:10.)

83. Expert Henson testified that a breath test result that is done more than 4.5 hours after a traffic stop cannot be used to determine a driver's BAC at the time of driving. (Pltf's Ex. 7, Henson Dep., at 34:21-23.)

84. Expert Henson testified that a DUI arrest should take two hours; however, this DUI arrest here took 4 to 4.5 hours, making it significantly abnormal. (Pltf's Ex. 7, Henson Dep., at 38:17-18.)

    Respectfully submitted,

    /s/ James P. McKay, Jr.
    James P. McKay, Jr.
    One of the Attorneys for Plaintiff

James P. McKay, Jr.
Of Counsel
Tomasik Kotin Kasserman, LLC
161 North Clark Street, Suite 3050
Chicago, Illinois 60601
(312) 605-8800
(312) 605-8808 (fax)
jim@tkklaw.com

**CERTIFICATE OF SERVICE**

   I hereby certify that on **June 6, 2022**, 1 electronically filed the foregoing **Plaintiff Michele Molina's Local Rule 56.1 Statement of Additional Material Facts in Response to Defendants' Motions for Summary Judgment** with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

| | |
|---|---|
| Attorney for Defendant Latronico<br>Jason A. Kanter<br>Assistant Attorney General<br>Office of the Attorney General<br>100 West Randolph Street, 13th Floor<br>Chicago, IL 60601<br>jkanter@atg.state.il.us | Attorney for Defendant David<br>Mary A. Johnston<br>Assistant Attorney General<br>Office of the Attorney General<br>100 West Randolph Street, 13th Floor<br>Chicago, IL 60601<br>mjohnston@atg.state.il.us |

             /s/ James. P. McKay
             TOMASIK KOTIN KASSERMAN, LLC