**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MICHELE M. MOLINA,

      Plaintiff,

v.

GLENN LATRONICO, et al.,

      Defendants.

No. 18-cv-6632
Judge Franklin U. Valderrama

**MEMORANDUM OPINION AND ORDER**

In the early morning hours of September 30, 2016, Chicago Police Officer Michele Molina (Molina), after an evening with friends at a few bars, was pulled over by Illinois State Police (ISP) Trooper, Eric David (Trooper David), for running a red light, and ultimately arrested for driving under the influence (DUI). Approximately four hours later, Molina was processed. Molina surmises that the stop and unusually long detention was retribution for her rejection of the romantic overtures by ISP Trooper Glenn Latronico (Trooper Latronico), Trooper David's colleague and friend. So, Molina sued Trooper Latronico and Trooper David (collectively, Defendants) asserting claims of unlawful seizure of her person under 42 U.S.C. § 1983 (Section 1983), and state law claims for civil conspiracy, malicious prosecution, and intentional infliction of emotional distress under Illinois law.

Defendants move for summary judgment under Federal Rule of Civil Procedure 56. R.[1] 88, David Mot. Summ. J.; R. 90, Latronico Mot. Summ. J.[2] For the reasons that follow, Trooper Latronico's motion for summary judgment is granted and Trooper David's motion for summary judgment is granted in part and denied in part.

## Background

### I.    Local Rule 56.1 Statements and Responses

Before considering the merits of the motions, the Court first addresses some Local Rule 56.1 and preliminary evidentiary issues.

Local Rule 56.1 governs summary judgment briefing in the Northern District of Illinois. When "a party moves for summary judgment in the Northern District of Illinois, it must submit a memorandum of law, a short statement of undisputed material facts [(L.R. 56.1 Statement)], and copies of documents (and other materials) that demonstrate the existence of those facts." *ABC Acq. Co., LLC v. AIP Products*

---

[1] Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation.

[2] Citations to the parties' briefs are identified as follows: "Latronico Mot. Summ. J." for Trooper Latronico's Motion for Summary Judgment; "Latronico Memo. Summ. J." for Latronico's Memorandum of Law in support of its Motion for Summary Judgment (R. 91); "David Mot. Summ. J." for Trooper David's Motion for Summary Judgment; "David Memo. Summ. J." for David's Memorandum of Law in support of its Motion for Summary Judgment (R. 89); "DSOF" for Trooper Latronico and Trooper David's Combined Local Rule 56.1 Statement of Undisputed Facts (R. 92); "Resp. DSOF" for Molina's Response to Trooper Latronico and Trooper David's Combined Statement of Undisputed Facts (R. 107); "PSOAF" for Molina's Local Rule 56.1 Statement of Additional Facts (R. 106); "Pl.'s Resp. Latronico" for Molina's Response to Trooper Latronico's Motion for Summary Judgment (R. 105); "Pl.'s Resp. David" for Molina's Response to Trooper David's Motion for Summary Judgment (R. 104); "Resp. PSOAF" for Trooper Latronico and Trooper David's Joint Response to Molina's Statement of Additional Facts (R. 128); "Latronico Reply" for Trooper Latronico's Reply in support of his Motion for Summary Judgment (R. 130); and "David Reply" for Trooper David's Reply in support of his Motion for Summary Judgment (R. 129).

*Corp.*, 2020 WL 4607247, at *7 (N.D. Ill. Aug. 11, 2020) (citing N.D. Ill. Local R. 56.1)). The L.R. 56.1 Statement must cite to specific pages or paragraphs of the documents and materials in the record. *Id.* (citing *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 818 (7th Cir. 2004)).

Under Local Rule 56.1(b) and (e), the nonmovant must counter with a response to the separate statement of facts, and either admit each fact, or, "[t]o dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact." N.D. Ill. Local R. 56.1(e)(3). "Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." *Id.*; *see Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) ("When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion."); *see also Daniels v. Janca*, 2019 WL 2772525, at *1–2 (N.D. Ill. July 2, 2019). If the non-moving party asserts additional facts not included in the moving party's statement of facts, the non-moving party is to file a statement of additional material facts "that attaches any cited evidentiary material not attached to the [moving party's statement of facts] or the non-moving party's response [thereto]." N.D. Ill. Local R. 56.1(b)(3). The Seventh Circuit has "repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings." *Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011).

Defendants object to several of Molina's statements of additional facts on the basis that the statement of fact violates Local Rule 56.1(a)(2) by containing more than one statement of fact. *See* Resp. PSOAF ¶¶ 15, 19, 20, 38, 39 (citing *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000) (each paragraph "should contain only one or two individual allegations")). Defendants' objection misses the mark.

Local Rule 56 provides that each statement of material fact "must consist of concise numbered paragraphs." N.D. Ill. Local R. 56.1(d)(1). Contrary to Defendants' suggestion, the Local Rule does not require each statement of material fact be limited to one statement of fact or a single sentence. *See Banks v. Illinois Central Railroad Company*, 2019 WL 3080923, at *3 (N.D. Ill. July 15, 2019) ("Nothing in Rule 56.1 instructs parties to include only one fact per paragraph.")

The Court now turns to resolving evidentiary objections made in the responses to certain statements of fact, beginning with Molina's objections.

## A.    Molina's Objections

Molina objects that certain language used in Defendants' statement of fact is "an opinion and not a fact." *See* Resp. DSOF ¶¶ 45, 50, 60, 65, 68 (objecting to the language "swerve," "numerous," "continued to deny," "weigh her options," and that an incident was "similar" to a prior incident).

As an initial matter, Molina does not support her objections based on certain language constituting "an opinion and not a fact" with any citation to authority. On that basis, Molina has forfeited the objections. *See*, *e.g.*, *White v. Richert*, 2019 WL 4062539, at *9 (N.D. Ill. Aug. 28, 2019) (citing *Pelfrense v. Vill. of Williams Bay*, 917

4

F.2d 1017, 1023 (7th Cir. 1990) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. We will not do his research for him.")).

Nevertheless, the Court reviews the statements of fact and construes Molina's objections as objections that the cited-to material does not support the statement of fact. Starting with the characterization of Molina's car "swerv[ing]," the Court finds this statement of fact unsupported by the cited-to materials. *See* R. 92-5, Defs. Exh. 5, David Answer ¶ 45; R. 92-2, Defs. Exh. 2, Pl. Dep. V. I Tr. at 37:18–38:1, 39:12–15; R. 92-3, Defs. Exh. 3, Pl. Dep. V. II Tr. at 63:14 –21; R. 92-12, Defs. Exh. 12, 9/30/2016 Video Pt. I, at 1:20–1:40. Accordingly, the Court sustains the objection.

Turning to Defendants' characterization of Molina stating "numerous" times she had not consumed alcoholic beverages, the Court finds this assertion is supported by the cited-to materials, namely that Molina denies consuming alcoholic beverages when asked by Trooper David on multiple occasions as reflected by the video footage from the traffic stop. *See* 9/30/2016 Video Pt. I at 2:00–20:40. The same is true regarding Molina's objection to the language in DSOF ¶ 60 that she "continued to deny" consuming alcoholic beverages. Therefore, the Court overrules the objection.

As for Molina's objection to Trooper David's statement of fact that he "let Plaintiff speak with her boyfriend to weigh her options," the Court finds this is the stated reason why Trooper David permitted Molina to speak with her boyfriend. DSOF ¶ 65. The same is true regarding Trooper David's statement of fact that he

5

"informed Plaintiff's boyfriend that he has [sic] pulled Plaintiff over in a similar situation in January 2016[.]" *Id.* ¶ 68. True, Molina may dispute that the two traffic stop incidents were, in fact, similar, however, that is not a basis to object to what Trooper David told Molina's boyfriend on September 30, 2016. The Court overrules the objection.

Molina also objects to a statement of fact that "she continued to deny alcohol consumption" as "argumentative characterization." Resp. DSOF ¶ 61 (citing 9/30/2016 Video Pt. 1 at 36:45–36:58; 37: 00–38: 38; Pl. Dep. V. I Tr. at 39: 12–15; Pl. Dep. V. II Tr. at 63: 14–21). Again, Molina fails to support the objection with any authority, and has forfeited the objection. Nevertheless, upon review of the cited sources, the Court finds that the statement of fact that Molina "continued to deny alcohol consumption" is unsupported by the cited source, as Trooper David asks only once during the video clip specified whether Molina has been drinking, to which she replies "No." Thus, the Court sustains Molina's objection.

Lastly, Molina objects to certain facts relating to CPD's internal investigation, and the outcome of that investigation, as unsupported by the cited-to sources. Resp. DSOF ¶ 112 (citing Pl. Dep. V. II Tr. at 117: 24–118:6; R. 92-23, Defs. Exh. 23, CPD Mediation Agmt., at Molina 00262). Upon review of the cited sources, the Court finds the testimony supports that Molina served a 25-day suspension, and the mediation agreement confirms the same, however, neither the testimony nor the mediation agreement specifies the conduct for which Molina was suspended for, as suggested by Defendants, simply reflecting that "[m]ember agrees not to contest either the

6

allegations of misconduct made or the BIA finding of Sustained for Log No. 1082456." *Id.* Thus, the Court sustains Molina's objection.

The Court next turns to Defendants' evidentiary objections.

## B. Defendants' Objections

Defendants object to a statement of fact by Molina relating to the resolution of the criminal state prosecution of the charges against her on the grounds that it is "inadmissible hearsay," citing *Gunville v. Walker*, 583 F. 3d 979, 985 (7th Cir. 2009). Resp. PSOAF ¶ 74. Specifically, Molina states:

> After viewing [dashcam video of the traffic stop and eventual arrest of Michele], the ASA concluded that there were not reasonable grounds to pursue the prosecution, and that the Cook County State's Attorney's Office therefore could no longer pursue the prosecution of Michele for Ticket #39208567, so the *nolle prosequi* order was entered on March 30, 2017, and, because the ASA based his determination on video evidence of the traffic stop, the case was terminated in her favor for reasons consistent with innocence.

*Id.* In support of the statement of fact, Molina cites to the Affidavit of Laura Morask – Molina's state court attorney. PSOAF ¶ 74; R. 106-13, Pl.'s Exh. 13, Morask Aff.

"An out-of-court statement offered to prove the truth of the matter asserted is generally inadmissible hearsay. Conversely, an out-of-court statement is not hearsay—and is generally admissible—if it is not offered to prove the truth of the matter asserted." *Lovelace v. McKenna*, 894 F.3d 845, 849 (7th Cir. 2018) (cleaned up).[3] In deciding a motion for summary judgment, the Court may only consider evidence that can "be presented in a form that would be admissible in evidence." Fed.

---

[3]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

R. Civ. P. 56(c)(2). However, the evidence offered at summary judgment must only "be of a kind admissible at trial" and "it need not be in the precise form that it would be offered (or admissible)" at trial. *Taylor v. Dart*, 2022 WL 4483908, at *2 (N.D. Ill. Sept. 27, 2022), *appeal dismissed sub nom. Taylor v. Pretty*, 2023 WL 7279288 (7th Cir. June 1, 2023) (citing *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 & n.2 (7th Cir. 1994)).

The Court finds that the cited section of Morask's Affidavit includes inadmissible hearsay. Specifically, Morask includes statements of what she allegedly heard from Assistant State's Attorney (ASA) Michael Clarke on a phone call. Morask Aff. ¶ 8. This is textbook hearsay. *See Kasalo v. NCSPLUS Inc.*, 2011 WL 2582195, at *1 (N.D. Ill. June 27, 2011) ("Hearsay precludes a witness from asserting as fact a statement made by someone else."). That is, Molina cites this statement of fact for the truth of the matter asserted. Thus, the Court will not consider the asserted statement of fact to the extent it purports to represent what third-party ASA Clarke told Morask, or the reasons for the *nolle prosequi*. However, the Court will consider the remainder of the statement of fact, e.g. the state criminal proceedings were *nolle prosequi*, which is supported by the Affidavit.

Defendants also object to certain statements of fact as unsupported by the cited testimony or source. Resp. PSOAF ¶¶ 1, 6, 21, 45. Regarding the first statement of fact, Defendants admit the statement of fact except for the allegation that Trooper Latronico "initiated text conversations" with Molina. Resp. PSOAF ¶ 1. Based upon the cited source, an excerpt from Molina's deposition, the Court agrees with

Defendants that the testimony does not support this statement of fact, and the Court sustains the objection as to that portion of the statement of fact. *See* Pl. Dep. V. I Tr. at 16: 3–4 and 18: 4–10.

The second statement of fact pertains to allegations about Trooper Latronico telling Molina he was married, and her response. Molina's cited testimony, however, does not support the statement of fact with the exception of Molina telling Trooper Latronico she was no longer interested in communicating with him. Pl. Dep. V. II Tr. at 163: 3–4. Therefore, the Court sustains the objection to the remaining portions of the statement of fact.

The third statement of fact relates to ISP protocol for keeping in-camera video on during a DUI arrest, and bringing an offender to the nearest police station without delay. PSOAF ¶ 21. In reviewing the cited testimony, the Court finds the testimony of Sergeant Susana Mathias supports that she learned in training to bring an offender to the nearest police station. R. 108, Pl.'s Exh. 2, Mathias Dep. Tr. at 20:22–21:4. However, that testimony does not support that bringing an offender to the nearest police station is an ISP directive, or address any ISP directive on camera during a DUI stop. *See id.* On that basis, the Court sustains the objection in part, and will only consider the properly supported portion of the statement of fact.

The fourth and last statement of fact pertains to details of the stop, and Molina's contention that when Trooper David informed other ISP troopers he was handling the stop it "seemed to confuse them." DSOF ¶ 45. The Court sustains the objection to the extent Molina purports to divine the state of mind of the other ISP

troopers. Molina of course can testify regarding her own observations of the ISP troopers reaction to Trooper David's statement.

The Court now turns to the material facts in the case, subject to the foregoing rulings, as it relates to the challenged claims.

## II. Material Facts

The following facts are set forth favorably to Molina, the non-movant, as the record and Local Rule 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012); *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 937 (7th Cir. 2003). While the Court draws all reasonable inferences from the facts in Molina's favor, the Court does not "necessarily vouch[] for their accuracy." *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015) (cleaned up); *see also Knopick v. Jayco, Inc.*, 895 F.3d 525, 527 (7th Cir. 2018) (cleaned up) ("Given this summary judgment lens, we do not vouch for the objective truth of all of these facts."). This background section details all material undisputed facts and notes where facts are disputed, to the extent the disputed facts are supported by record evidence. To the extent the video footage clearly contradicts Molina, however, the Court considers that evidence without favoring her as the non-movant. *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018). That is because the Court only views evidence in the non-movant's favor when there is a *genuine* dispute about the facts. *Id.*

## A. Background of Molina, Trooper David, and Trooper Latronico

Molina has been an officer with the Chicago Police Department (CPD) since April 2015. Resp. DSOF ¶ 6. Trooper Latronico has been an ISP Trooper since August 2014, and Trooper David has been an ISP Trooper since 2013. *Id.* Trooper Latronico

and Trooper David were assigned the same shift from 2014 to 2016, and are friends. *Id.* ¶ 7. As an ISP Trooper, Trooper David has experience with DUI arrests. Resp. PSOAF ¶¶ 24–25.

In 2016, Trooper David was assigned to District Chicago south sector and Trooper Latronico was assigned to District Chicago. Resp. DSOF ¶ 8. The south sector does not include the City of Chicago. PSOAF ¶ 15.

### B.     ISP Trooper Protocols

Troopers start and end their shifts at their homes. Resp. DSOF ¶ 9. During their shift, troopers get one hour of personal time. PSOAF ¶ 17. The parties dispute whether Troopers are required to stay in their assigned area during their shift. DSOF ¶ 10; Resp. DSOF ¶ 10. Although the parties seemingly agree that a Trooper should stay in his or her area unless needed elsewhere, Trooper David testified that under certain circumstances, none of which is present here, a Trooper can leave his or her assigned area. R. 92-7, Defs.' Exh. 7, David Dep. Tr. at 103: 16–24. However, Sergeant Mathias and Special Agent Andrew Aguilar testified that Troopers are to remain in their assigned areas unless they are needed elsewhere. PSOAF ¶ 18; *see also* R. 108, Pl.'s Exh. 2, Mathias Dep. Tr. at 24: 18–21; R. 109, Pl.'s Exh. 3, Aguilar Dep. Tr. at 14: 5–8. Trooper Latronico testified that if a Trooper is leaving his or her assigned area for personal time, they must notify their supervisor. R. 92-6, Defs.' Exh. 6, Latronico Dep. Tr. at 40; 19–23. The Court notes there is nothing in the record to suggest that any circumstance was present to support that Trooper David was needed in the area where the traffic stop of Molina occurred on September 30, 2016. *See* Material Facts Section II.E, *infra*.

Troopers follow ISP directives in carrying out their duties. ISP directive "ENF-018, Driving Under the Influence Enforcement and Proceeding" provides the procedure for driver submission to Preliminary Breath Tests (PBTs), and directs that an ISP "officer will complete the Warning to Motorist form, provide a copy to the driver, and read the Warning to Motorist to driver[.]" Resp. PSOAF ¶ 19. Additionally, the directive requires that "once a refusal to submit has been communicated to the arresting officer, the officer will immediately complete the appropriate portion of the report" and if "the driver agrees to submit to and completes the chemical test(s) requested, the arresting officer will complete the appropriate portion of the test(s) [if they] disclose . . . An alcohol concentration of .08 or more." *Id.* ¶ 19.

ISP directive "EQP-015, In-Car Video Camera Recording Equipment," provides, in relevant part:

> V.B.1. Officers in uniform will video and audio record every enforcement stop as defined in paragraph III.A. This includes criminal violations discovered as a result of a stop.
>
> . . .
>
> V.B.4. The recording will not be interrupted or stopped until completion of the enforcement stop. The enforcement stop is considered complete when the subject of the enforcement stop or the officer has left the scene. In cases where the officer is transporting a subject, the stop is considered complete upon arrival at the destination.
>
> . . .
>
> V.B.10. Officers will video and audio record activities inside the vehicle when transportation an arrestee.
>
> . . .

12

V.E.3. Except for evidentiary purposes, reproduction of video medium recorded by district personnel is prohibited unless authorized by the District Commander or designee.

PSOAF ¶ 20. It is undisputed that ISP directives require an in-car camera to be on at all times when a DUI offender is being questioned, and while the offender is placed in the backseat of the squad car. Resp. PSOAF ¶ 21. A failure to keep the video and audio on is a violation of ISP rules and regulations. *Id.* ¶ 23.

## C.    Relationship Between Trooper Latronico and Molina

Molina met Trooper Latronico at the scene of an accident in August 2015, and Trooper Latronico obtained Molina's phone number. Resp. DSOF ¶¶ 11–12. After their meeting, Molina and Trooper Latronico exchanged text messages and photographs. DSOF ¶ 13. Although Molina and Trooper Latronico never dated, or had intimate relations, the record supports that Trooper Latronico complimented Molina on her looks and wanted to take her to dinner. Resp. DSOF ¶ 15; Resp. PSOAF ¶ 1.

Molina states that Trooper Latronico sent her several photos of himself, including one of himself seemingly in the nude of his upper body in a bathroom and one of himself in his ISP vehicle displaying his erect penis. PSOAF ¶ 4. Trooper Latronica does not recall sending the photographs to Molina and therefore denies the allegation, but does not deny that he is the individual in the photographs. Resp. PSOAF ¶ 4. Unsurprisingly, Sergeant Mathias testified that it is unacceptable for a trooper to take a photograph of himself exposing his penis while in uniform in a marked squad car. *Id.* ¶ 5.

The parties dispute whether Trooper Latronico told Molina he was married when they met, however, Molina cut off communication after that alleged disclosure. PSOAF ¶ 6; Resp. PSOAF ¶ 6. From December 2015 to January 31, 2016, Molina and Trooper Latronico did not talk. Resp. DSOF ¶ 17.

### D.    January 31, 2016 Traffic Stop and Aftermath

On January 31, 2016, Molina was pulled over by Trooper David near the I-55 Stevenson Expressway. DSOF ¶ 18. During the traffic stop, Molina told Trooper David that she knew Trooper Latronico. *Id.* ¶ 19. During the stop, Molina called Trooper Latronico and told him she was with Trooper David. Resp. PSOAF ¶ 10. Trooper David returned to his squad car and answered a call from Trooper Latronico. *Id.* ¶ 11. During the conversation, Trooper Latronico asked, "What're you doing to her?" and Trooper David responded, "Your fucking friend's a piece of shit, dude." *Id.* ¶ 11. Other statements made during the call include Trooper Latronico stating, "tell her to thank me properly" and "tell her she better be on her hands and knees later." *Id.* ¶ 12. The parties dispute whether Trooper Latronico said, "tell her to put me in her fucking asshole," which Molina contends, versus Trooper Latronico submitting that he said, "tell her to quit being a fucking asshole." *Id.* The video recording supports Defendants' position that Trooper Latronico said, "tell her to quit being a fucking asshole." R. 92-8, Defs. Exh. 8, Video 1/31/2016 Stop at 8:19. In the recording, Trooper David also told Trooper Latronico "I'm going to make her blow in the PBT too just for giggles." Resp. PSOAF ¶ 13. After speaking with Trooper Latronico, Trooper David reapproached Molina and told her "if I were you, I would take your

14

tone and change it. We're saving you and your job." *Id.* ¶ 14. The traffic stop did not result in any citation or charge. DSOF ¶ 21. After the traffic stop, Trooper Latronico and Molina spoke by telephone, and Molina suggested that Trooper Latronico made things worse with Trooper David when he spoke to him during the traffic stop. DSOF ¶ 23; Resp. DSOF ¶ 23.

Communications between Trooper Latronico and Molina did not resume until September 2016, when Trooper Latronico contacted Molina and asked to sleep on her couch before a court appearance. DSOF ¶ 24. Molina said "no," but he continued to ask her through text message and Snapchat, and she stopped responding. Resp. DSOF ¶¶ 25–26; Resp. PSOAF ¶¶ 7–8. Molina never disclosed her home address to Trooper Latronico. DSOF ¶ 14. Molina believed Trooper Latronico was angry that she declined to give him her address based on his reaction. PSOAF ¶ 9.

### E.    September 30, 2016 Traffic Stop and Arrest

Molina did not have any further contact with Trooper David until a September 30, 2016 traffic stop and arrest, which is the crux of Molina's claims against Defendants. Resp. DSOF ¶ 26.

#### 1.    Events Preceding Traffic Stop

On September 29, 2016, Molina went to dinner with friends at a restaurant in Chicago and consumed one-and-a-half margaritas. Resp. DSOF ¶ 27. Molina later drove to the Blue Light, a bar located on north Western Avenue in Chicago, around 12:00 a.m. *Id.* ¶ 28. At the bar she met up with the friends she went to dinner with,

and her then-boyfriend, CPD officer Chris Sloniec. *Id.* ¶ 29. Molina took a photo of the sign at Blue Light and posted it to her Snapchat story. *Id.* ¶¶ 30–31.

It is undisputed that Officer Latronico viewed Molina's Snapchat story. PSOAF ¶ 31; Resp. PSOAF ¶ 31. The parties dispute whether Trooper Latronico took a screenshot of the photo from Molina's story. DSOF ¶ 32; Resp. DSOF ¶ 32; PSOAF ¶ 32; Resp. PSOAF ¶ 32. Trooper Latronico points out that the arrow indicating a screenshot on the Snapchat application did not appear next to his name, but Molina insists that she received a notification on her phone alerting her to the screenshot. *Id.* Molina received the notification of the screenshot approximately on noon on September 30, 2016. Resp. DSOF ¶ 33. Molina posits that Trooper Latronico must have shared her Snapchat photo showing her location with Trooper David. DSOF ¶ 34. However, there are no records in evidence supporting Molina's belief.

At the Blue Light, Molina had one to two drinks. Resp. DSOF ¶ 35. Molina and Sloniec left the bar in separate cars to go to his house. *Id.* ¶ 36. Molina was driving northbound on Western Avenue near Addison Street, and contends the road conditions included gravel everywhere, cones in the middle and between curbs, and shifting lanes. *Id.* ¶ 37.

### 2. Trooper David's Location

On September 30, 2016, at approximately 4:46 a.m., Trooper David was on-duty, but approaching the end of his shift. DSOF ¶ 38. At the time, he was assigned to the south sector midnight shift and reported to Sergeant George Jimenez, his supervisor and master sergeant. Resp. PSOAF ¶ 16. It is undisputed that on that date

Trooper David left his assigned area without notifying his supervisor. Resp. DSOF ¶ 10.

The parties dispute why Trooper David was in the area, namely Western Avenue near Addison Street, which is outside of his assigned area in the south zone of District Chicago. Trooper David explains that he was going to his condominium located at Irving Park Road and California, which he had sold and moved out of, to retrieve a package before returning to his residence on the West side of Chicago. DSOF ¶ 39. Molina, on the other hand, points out that Trooper David has provided several conflicting reasons why he was in the area. Resp. DSOF ¶ 39. Specifically, she identifies Trooper David's testimony affirming that he just happened to be in the area, but that during an ISP investigation Trooper David said he was there to pick up packages from his family in the area. *Id.* The record supports that Trooper David has offered varying accounts for his presence in the area. Either way, Trooper David was driving on Western Avenue, in his squad car, with dashcam on behind Molina, who was driving behind Sloniec's car. *Id.* ¶ 40. Molina surmises that "there was no way for Trooper David to just randomly show up at the location of the arrest without Latronico communicating" her location at the Blue Light that night. *Id.* ¶ 34.

The dashcam footage shows portions of the events from September 30, 2016, however, the dashcam was not on for the entire incident and detention, in violation of ISP directives. Resp. DSOF ¶ 41.

### 3. September 30, 2016 Incident

On September 30, 2016, Molina, while following Sloniec's car, ran a red light. DSOF ¶ 42; Resp. PSOAF ¶ 34. Running a red light is a traffic violation. DSOF ¶ 43. Trooper David also contends that he observed Molina driving over dividing lanes several times, whereas Molina explains that the street was torn up, and the dividing lines were not visible. DSOF ¶ 44; Resp. DSOF ¶ 44.

### a. The Stop

Trooper David pulled Molina over. DSOF ¶ 45. The video from the stop reflects that Trooper David identified himself as an ISP Trooper and almost immediately told Molina she looked familiar, and told her she ran a red light. DSOF ¶ 46; Resp. DSOF ¶ 46; Resp. PSOAF ¶ 36. Trooper David also informed Molina that he smelled alcohol, her eyes were glassy and bloodshot, and her speech was slurred. DSOF ¶ 47.[4] Trooper David purports that he recognized Molina from the January 2016 stop. *Id.* ¶ 48.

Molina informed Trooper David she worked for the CPD, and also mentioned that she knew Trooper Latronico. DSOF ¶ 49. This was approximately 20 minutes into the stop, and Trooper David responded, "that's my boy," and asked how she knew him. Resp. PSOAF ¶ 41. Molina contends that Trooper David said, "You weren't so nice to my boy, were you?" however, she does not identify anywhere in the video footage where this exchange took place, and only cites to her own testimony in support thereof. Resp. DSOF ¶ 49. Review of the video footage cited by Defendants

---

[4]Officer Molina purports to deny this statement of fact of what Trooper David noted, however she does not submit evidence which contradicts what Trooper David noted, and instead submits additional purported facts in her denial, which is improper and violates Local Rule 56.1(e)(2). On that basis, the statement of fact is deemed admitted.

supports that Trooper David said, "that's my boy." R. 92-12, Exh. 12, 9/30/2016 Video Pt. 1 at 20:00–20:07.

However, it is undisputed that Trooper David was aware that Molina knew Trooper Latronico "well before" she told Trooper David that she knew Trooper Latronico, and that Trooper David recognized her within seconds of seeing her on September 30, 2016, and he ultimately told her that he had previously stopped her. Resp. PSOAF ¶¶ 42, 44.

In the dashcam footage, Molina denies consuming alcohol. DSOF ¶ 50. Trooper David directed Molina to exit her vehicle, which she did. Resp. DSOF ¶ 51. Trooper David reminded Molina he had previously pulled her over under similar circumstances, and let her go, but because of the prior stop he needed to conduct a Field Sobriety Test (FST). Resp. DSOF ¶ 52. During the FST, Trooper David did not allow Molina to wear shoes, which he contends would have been a violation of FST procedure because her shoe heel was more than two inches. Resp. PSOAF ¶ 48. Molina submits that Trooper David told Sloniec, "we have a video" of the first time he pulled Molina over and asked him, "do you want to see it?" PSOAF ¶ 49. Trooper David denies saying this, instead contending he said, "we will have a video if you want to see it." Resp. PSOAF ¶ 49. Review of the cited-to video confirms Trooper David's version of this interaction. *Id.*; 9/30/2016 Video Pt. 1 at 27:05–27:10. Trooper David allowed Molina to speak with Sloniec during the stop. DSOF ¶¶ 65, 67.

After Molina removed her shoes, Trooper David told Molina that the FST would be done in three to four minutes, and the only reason they were doing the FST

19

was because of the previous traffic stop. Resp. PSOAF ¶ 50. Specifically, Trooper David stated "this is not the first time we've had this conversation. Last time we didn't even go there, that's why we're here this time. So, if we're going to let you go again, we're going to have to know that you are sober beyond a shadow of a doubt." Resp. PSOAF ¶ 52; DSOF ¶ 61. Trooper David conducted the FST in the right-hand lane of Addison street, and on the sidewalk to the right of the street. DSOF ¶ 53. The FST began approximately 20 minutes after the stop, and Molina admits that she did not complete any portion of the FST successfully. *Id.* ¶ 54. Molina explains that the weather conditions were not ideal (rain, wind, and cold weather), and that the "proper protocol for when weather is affecting tests is to advise the person she is not under arrest, but that, out of fairness, officers want to relocate her to a location to get her out of the elements, to conduct the tests," which she was not advised of here. Molina also points out that Trooper David failed to conduct the tests in view of the dashcam, as required. Resp. DSOF ¶¶ 54–57.

### b. Molina Is Placed in Trooper David's Squad Car

At approximately 5:21 a.m., Trooper David handcuffed Molina and placed her in his squad car at DSOF ¶ 62. Molina was not read her *Miranda* rights. *See* Resp. DSOF ¶¶ 62–63. Trooper David explained that he wanted her to sit in the car and think about what she wanted to do, as she did not submit to a breathalyzer, and that he was "not going to put anything on the radio just yet." Resp. PSOAF ¶ 53. Molina continued to deny consuming alcohol, and Trooper David asked her to take a PBT,

and explained that if she had not consumed alcohol the test would so reflect and she could go home. DSOF ¶ 61.

Molina eventually admitted to Trooper David that she had been drinking and that she did not know what the PBT would reveal. Resp. DSOF ¶ 66. Molina discussed with Sloniec the number of drinks she had and estimated she had anywhere between three to as many as six drinks. *Id.* ¶ 70. Eventually Molina took the PBT and tested .135, over 1.5 times the legal limit of .08. DSOF ¶ 71; PSOAF ¶ 54. Trooper David then transported Molina to the CPD First District at 1718 South State Street, Chicago, Illinois. Resp. DSOF ¶ 72. Recall that the stop occurred on the northside of Chicago.

The parties dispute why Trooper David took Molina to this CPD precinct. Trooper David states, without any support, that he was not sure if other districts (presumably closer districts) would process a female arrestee, but he knew the Lieutenant working at the First District, and he believed it would be quickest. DSOF ¶ 73. Not so, counters Molina. According to Molina, Trooper David told her that he was taking her to "wait it out" and he admitted that several other CPD precincts were closer to the arrest location, e.g. the Belmont and Western station. Resp. DSOF ¶¶ 73–74. It took Trooper David 16 minutes to drive to the First District precinct. DSOF ¶ 74. At the First District, Trooper David exited his squad car and locked it, leaving Molina in the squad car for approximately 20–30 minutes. *Id.* ¶¶ 76–77; Resp. DSOF ¶ 78.

During this time, the in-car dashcam video was not turned on in violation of ISP directives. Resp. PSOAF ¶¶ 21–23. Trooper David testified that he believed the audio and video camera were on at that time. *Id.*; David Dep. Tr. at 276:20–277:4. Curiously, Molina was not processed, booked, or charged at the First District. Resp. DSOF ¶ 81. Instead, according to Trooper David, he was instructed to take Molina to the 16th District at 5151 North Milwaukee Avenue, Chicago, Illinois by Sergeant Jimenez. DSOF ¶ 79.[5] So, Trooper David, remarkably, in search of a CPD district who would process a female arrestee who failed a FST, now heads back to the north side of Chicago.

Trooper David then drove to the 16th District. Resp. DSOF ¶ 84. Molina maintains that during this transport, Trooper David asked her whether she wanted to see her "greatest hits" and played the video from his prior traffic stop of her, which he denies, submitting that ISP troopers cannot keep videos of stops for any reasons. PSOAF ¶ 56; Resp. PSOAF ¶ 56. Molina testified that Trooper David laughed and taunted her while he played the video, and that she began to cry and she asked him three times to turn the video off before he actually did. PSOAF ¶ 57; DSOF ¶ 94; Resp. DSOF ¶ 94; DSOF ¶¶ 95–96; Resp. DSOF ¶¶ 95–96. Molina contends that when she asked Trooper David where he was taking her, he ignored her, did not answer her, and she feared that he was taking her to meet Trooper Latronico. PSOAF ¶ 61.

---

[5]Molina does not object based on hearsay to the statement of fact on the directions Trooper David was given to take Molina to the Sixteenth District. However, Molina, citing to the deposition of Trooper David's supervisor, Sergeant Jimenez, contends that the Sergeant was "perplexed" that Trooper David would travel so far from the north side stop. Resp. DSOF ¶ 79.

Upon arrival at the 16th District, Trooper David exited the squad car, leaving Molina alone again in his squad car. Resp. DSOF ¶ 97. Notably, Trooper David does not include the time upon which he arrived at the 16th District, and there is no dashcam footage to provide this information, either. *See* DSOF ¶¶ 82–83. Molina testified that at this point the sun was up, and she felt they had been driving for a long time, and that it should not take that long to travel from the First to the 16th District. PSOAF ¶ 62. Sergeant Jimenez also arrived at the 16th District and pulled behind the squad car, and Trooper David was instructed to release Molina and drive her home. DSOF ¶¶ 98–99. Trooper David returned to his squad car, removed Molina from the back seat, unhandcuffed her, and told her she would not be charged or booked. DSOF ¶ 100; PSOAF ¶ 63.

Molina testified that when she tried to go into the station to call an Uber or someone for a ride, Trooper David refused to let her, and stated he would take her home. PSOAF ¶ 64. Molina was scared and felt he was playing a "sick game" with her. *Id.* ¶ 65. Molina was scared to ride with Trooper David to her house so she provided him with her boyfriend's address. *Id.* ¶ 66.

Trooper David then began driving Molina to her boyfriend's home, with Sergeant Jiminez trailing. DSOF ¶ 101. However, Trooper David and Sergeant Jimenez received phone calls from ISP Master Sergeant Margaret McGreal who allegedly instructed them to stop and await further instruction. *Id.* ¶ 102. Trooper David and Sergeant Jimenez pulled into a convenience store parking lot and waited for approximately ten minutes, and then returned to the 16th District where Molina

was told she would be processed. *Id.* ¶¶ 103–104. Molina disputes this time period and contends it was between 20 to 30 minutes, and that she remained in the backseat locked in the car for the duration. Resp. DSOF ¶ 104. They arrived at the 16th District at approximately 9:00 a.m. DSOF ¶ 105.

At 9:23 a.m., after a required 20-minute observation period, Trooper David administered a breathalyzer and Molina blew a .11, which is .03 over the legal limit. DSOF ¶ 106.

**F.      Trooper David's Communications on September 30, 2016**

One of the key disputes between the parties is whether Trooper David and Trooper Latronico were in communication during the events of September 30, 2016.

During the stop, it is undisputed that Trooper David was communicating with Sergeant Mathias over the IWIN system, and that he instructed her to "check your snapchat[.]" PSOAF ¶ 38. He sent several messages to Sergeant Mathias, including the following:

so, remember the CPD chick that was a complete B[?]

Can you give Orta the heads up that she's CPD
And tell him the whole story so he doesn't think im some asshole

Give him the whole store from last time etc.

And if he needs me to call him ill call him when I get down to 001

theyre already waiting for her

STRESS THE WHOLE 107/55 LAST TIME LOL
THIS TIME SHE JUST GOING THROUGH RED LIGHTS AND DRIVING IN
BETWEEN TWO LANES

ILL BE SURE TO GET THAT ON CAMERA

24

> THAT'S FINE
> THIS IS BIGGER THAN JUST STOPPING A CPD THO
> THERES A BACK STORY BUT I DON'T HAVE TIME TO EXPLAINT [SIC]
> MYSELF TO HIM

Resp. PSOAF ¶ 38 (emphasis in original). Sergeant Mathias testified it was inappropriate for Trooper David to refer to someone as "bitch," and she did not respond to ask why she should check her Snapchat. *Id.* ¶ 40.

During the stop, Trooper David received several notifications on his cell phone and through the ISP messaging service on his in-car laptop, but Molina was unable to see any of these messages. DSOF ¶ 69. Molina testified that Trooper David spoke with someone on the phone who she believed to be Trooper Latronico. *Id.* ¶¶ 85–86. Molina testified that she heard Trooper Latronico's laughter and heard Trooper David say "Yeah, I got her back here. She's not so uppity now. She's even crying back here. She's a lot nicer now. You'd love this." Resp. DSOF ¶ 86. Molina testified she recognized Trooper Latronico's voice because of the phone conversations she had previously had with Trooper Latronico. *Id.* ¶ 87.

The parties also dispute whether Molina and Trooper Latronico had spoken since the January 2016 traffic stop. Trooper Latronico insists that they did not, whereas, Molina maintains that they spoke a few weeks before the September incident when he called her to ask if he could sleep on her couch. DSOF ¶ 87; Resp. DSOF ¶ 87. Trooper Latronico does not deny prior conversations with Molina on the phone, but disputes the purported length of time of those phone calls. *See*, *e.g.*, Resp. PSOAF ¶ 60.

Trooper David and Trooper Latronico deny communicating with each other during the September 2016 stop. Resp. PSOAF ¶¶ 55, 59. There are no call records between Trooper David and Latronico during the September incident. DSOF ¶ 92. Molina admits this fact, but maintains that Trooper Latronico had other social media platforms on his phone at the time. Resp. DSOF ¶ 92. In 2016, both Trooper David and Trooper Latronico had several social media platforms on their cell phones, including Snapchat, and both acknowledge that Snapchat is an application where messages or photos disappear. Resp. PSOAF ¶¶ 28–29. Trooper Latronico testified that he knew he could use Snapchat to send pictures, videos, and messages, but did not know users can use the platform to make phone calls, and testified that he never used that feature. DSOF ¶¶ 90–91. In 2016, ISP officers, like Trooper David and Trooper Latronico, also had an ISP application "10-21" which allowed them to make a phone call using the 10-21 application, and it would show the number of the ISP main precinct on the recipient's caller ID instead of the ISP officer's cell phone number. PSOAF ¶ 30; Resp. PSOAF ¶ 30.

Ultimately, Molina has not adduced evidence showing any communications between Trooper David and Latronico through any platform or application on September 30, 2016. Troopers David and Latronico affirmatively state that they did not communicate via telephone, text, Snapchat, IWIN, or any other platform on September 29, 2016 or September 30, 2016. DSOF ¶ 93.

### G.    Trooper David's Report

Trooper David drafted his report of the incident at the 16th District the morning of September 30, 2016. DSOF ¶ 107; Resp. ¶ 107; David Dep. Tr. at 257: 15–20. However, Trooper David did not submit the report until that evening. Resp. PSOAF ¶ 67. Trooper David's report reflects that Molina (1) displayed six out of six signs for alcohol consumption for the Horizontal Gaze Nystagmus Test (DSOF ¶ 55); (2) displayed five out of the eight signs for alcohol consumption in the heel-to-toe test (*id.* ¶ 57); and (3) two out of the four signs for alcohol consumption (*id.* ¶ 58).

Molina contends that Trooper David's report contains numerous errors. For example, the report fails to include her PBT test result. The report, per Molina, also incorrectly states that: Molina refused the PBT, that her eyes were bloodshot; and that her hair color was blond or strawberry. PSOAF ¶¶ 68–70, 75. Molina also points out that Trooper incorrectly wrote that Molina was fingerprinted at the First District, when in fact she was fingerprinted at the 16th District, which Trooper David concedes. Resp. PSOAF ¶ 71.

Trooper David maintains that it is not mandatory to include the PBT test result in the report, that Molina did refuse to take the PBT because she failed the FST and was placed under arrest, that her hair appeared blond or strawberry to him, and that the submitted exhibit of her mugshot is not of a quality to display if her eyes were or were not bloodshot. Resp. PSOAF ¶¶ 68–70, 75.

### H. Charges Brought Against Molina and Effect

On September 30, 2016, Molina was issued citations for DUI, improper traffic lane usage, disregard of an official traffic control device, and expired registration. Resp. DSOF ¶ 108; PSOAF ¶ 72. Molina bonded out on September 30, 2016 at 12:00 p.m. Resp. DSOF ¶ 110. At some unspecified point, Molina met with CPD's Internal Affairs, was stripped of her badge, and charged internally with DUI, being arrested for DUI, and being intoxicated off-duty. *Id.* ¶ 109.

Following her arrest, Molina was placed on desk duty. DSOF ¶ 111. In a CPD mediation related to the incident, Molina did not deny the allegations and received a 25-day suspension, and was required to complete an alcohol rehabilitation program. DSOF ¶ 113. Molina posits she was not chosen for certain CPD teams because of this incident (Resp. DSOF ¶ 116), that she incurred legal fees (*id.* ¶ 117), lost weight and missed several menstrual cycles (*id.* ¶ 118), and was nervous and could not sleep because she believed Trooper David provided Trooper Latronico with her address. *Id.* ¶ 119.

On March 30, 2017, the charges against Molina were *nolle prosequi*. Resp. DSOF ¶ 114. Molina was required to pay a fine for negligent driving. *Id.* ¶ 115.

### I. ISP Investigation

Approximately two years after her arrest, Molina filed a complaint against Trooper David and Trooper Latronico on November 12, 2018, with the ISP Division of Internal Investigations alleging "Improper Conduct and Bringing the Department in [sic] Disrepute." Resp. PSOAF ¶ 76; Resp. DSOF ¶ 121. Molina alleged that

Defendants conspired to arrest her without evidence for the purpose of harassing and taunting her. *Id.*

Trooper David received a two-day suspension because his dashcam was off after he left the First District with Molina in his squad car. Resp. DSOF ¶ 122. Trooper Latronico did not receive any discipline. *Id.*

Molina subsequently filed this Section 1983 action against Trooper Latronico and Trooper David, asserting claims of unlawful seizure of her person (Count I), civil conspiracy (Count II), malicious prosecution (Count III), and intentional infliction of emotional distress (Count IV). Defendants move for summary judgment under Rule 56. *See* Latronico Mot. Summ. J.; *see* David Mot. Summ. J. The fully briefed motions are before the Court.

## Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008).

If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A genuine issue of material fact exists if "the evidence is such

that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

## Analysis

The Court addresses Trooper David and Trooper Latronico's motions for summary judgment on each of Molina's claims against them below.

### I.      Unreasonable Seizure (Count I)

Section 1983 provides that a person may not be deprived of any constitutional right by an individual acting under color of state law. *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009). To prevail on a Section 1983 constitutional claim, a plaintiff must show that he or she was "deprived of a right secured by the Constitution or federal laws, by a person acting under color of law." *Thurman v. Vill. Of Homewood*, 446 F.3d 682, 687 (7th Cir. 2006). The Fourth Amendment, made applicable to the states by the Fourteenth Amendment, provides in pertinent part that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend IV. Thus, an unreasonable seizure conducted by a state police officer is a constitutional violation

of the Fourth Amendment as made applicable by the Fourteenth. *See Baker v. McCollan*, 443 U.S. 137, 142 (1979).

An arrest is one type of seizure, and a seizure ripens into "an arrest when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *U.S. v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999) (cleaned up). An arrest must be supported by probable cause, however, lesser seizures need only be supported by reasonable suspicion. *See*, *e.g.*, *United States v. Lopez*, 907 F.3d 472, 478 (7th Cir. 2018) (discussing *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). Generally speaking, "probable cause is an absolute defense to claims under section 1983 against police officers for an allegedly unreasonable seizure, whether a false arrest or a wrongful pretrial detention." *Norris v. Serrato*, 761 Fed. App'x. 612, 615 (7th Cir. 2019) (citing *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015)).

Where a traffic violation is the justification for a seizure, a traffic stop may become unlawful if it is prolonged beyond the time reasonably required to complete issuing the ticket for the traffic violation. *Rodriguez v. U.S.*, 575 U.S. 348, 349 (2015). Thus, if an officer "extend[s] the traffic stop beyond the time necessary to issue the traffic citations," he must have independent reasonable suspicion that additional criminal activity is afoot. *United States v. Rodriguez-Escalera*, 884 F.3d 661, 668 (7th Cir. 2018).

Further, a constitutional violation may occur when "searches or seizures [were] conducted in an extraordinary manner, unusually harmful to an individual's privacy

or even physical interests." *Whren v. U.S.*, 517 U.S. 806, 818 (1996). "Needless delay, or delay for delay's sake—or, worse, delay deliberately created so that the process becomes the punishment—violates the fourth amendment." *Portis v. City of Chicago*, 613 F.3d 702, 705 (7th Cir. 2010) (citing *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991)); *see Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 436–437 (7th Cir. 1986); *Chortek v. City of Milwaukee*, 356 F.3d 740, 747 (7th Cir. 2004) (applying the *Gramenos* framework and reciting facts that may justify delays in booking)). Ultimately, an initially lawful seizure may ultimately violate the Fourth Amendment. *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

## A.  Trooper David's Liability

Molina alleges several unconstitutional seizures in connection with the September 30, 2016 traffic stop and eventual arrest. As the Court understands it, these seizures include: (1) being pulled over by Trooper David for the alleged traffic violations (*see* Pl.'s Resp. David at 4–5); (2) Trooper David unnecessarily prolonging the traffic stop to last approximately 25 minutes (beginning at 4:55 a.m., until her arrest, at approximately 5:21 a.m.) in order to gather evidence for her arrest (*id.* at 6); (3) there was no probably cause for Molina's arrest  (*id.* at 3); and (4) time from her arrest at approximately 5:21 a.m. until her booking at approximately 9:00 a.m. and intoximeter at 9:23 a.m.[6] *Id.*

Trooper David argues that he is entitled to summary judgment because Molina was not subject to any unlawful seizure because he had probable cause to initiate the

---

[6]Molina also argues it was a violation of her constitutional rights when Trooper David denied her request to speak with an FOP attorney, although she does not develop or support this

traffic stop and to arrest her for DUI. David Memo. Summ. J. at 8–10. He further contends that the delay from arrest to processing was not unreasonable. *Id.* at 10–12. Predictably, Molina disagrees, arguing that there was no probable cause to arrest her, and Trooper David's delays were unreasonable and motivated by "ill will." Pl.'s Resp. David at 2–7 (citing *Moore v. Marketplace Rest., Inc.*, 754 F.2d 1336, 1350–51 (7th Cir. 1985); *Gramenos*, 797 F. 2d at 437). Molina points out that other precincts were closer, yet Trooper David took her to the First District. Not only that, but he left her handcuffed in the backseat of his squad car, drove her to another precinct but did not bring her in for an arrest report, telling her he was taking her home only to spend time in a parking lot and return to the station for booking, and taking nearly four-and-a-half hours for the entire stop and arrest. Pl.'s Resp. David at 7.

The Court addresses each alleged constitutional violation in turn.

### 1.    Initial Traffic Stop

Starting with the traffic stop, putting aside the fact that Trooper David was outside of his assigned sector without permission, the Court finds that there is no question of fact that Trooper David had probable cause to pull over Molina for the traffic violation. Molina ran a red light, which is captured by the dashcam video in evidence in this matter. DSOF ¶ 42; Resp. PSOAF ¶ 34. Not that it matters, but Molina admits that she did, in fact, though unintentionally, run a red light, which is a violation under Illinois law despite Molina's intention. Resp. DSOF ¶ 42. Police may

---

argument, and therefore waives the argument. Pl.'s Resp. David at 8; *see United States v. Cisneros*, 846 F.3d 972, 978 (7th Cir. 2017) ("We have repeatedly and consistently held that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (cleaned up).

lawfully effectuate a traffic stop when they observe a traffic violation. *United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005). So, Trooper David's initial traffic stop, based on his observation of Molina running the red light, does not in itself run afoul of the Fourth Amendment. The next question is whether Trooper David unlawfully prolonged the stop.

### 2.    Length of Traffic Stop to Arrest

Next, the Court addresses Molina's contention that the traffic stop lasting approximately 25 minutes, beginning at 4:55 a.m., until her arrest, at approximately 5:21 a.m. was excessive and constituted an unreasonable seizure. Pl.'s Resp. David at 5–6. Molina posits that Trooper David unlawfully prolonged the stop to gather additional evidence to justify her arrest, including forcing her to undergo a FST. *Id.* She insists that he did so for improper reasons, namely, "he believed he missed out an opportunity to arrest [Molina] in January 2016 and was not about to miss another opportunity to place her in handcuffs." *Id.* at 6–7. Trooper David retorts that it matters not that that he may have disliked Molina, since he had legal justification to continue to detain her and subject her to a field sobriety test. David Reply at 4–5 (citing *Holmes v. Vill. of Hoffman Est.*, 511 F.3d 673, 679 (7th Cir. 2007) ("Probable cause is assessed objectively: a court looks at the conclusions that the arresting officer reasonably might have drawn from the information known to him rather than his subjective reasons for making the arrest.").

As stated above, if an officer "extend[s] the traffic stop beyond the time necessary to issue the traffic citations," he must have independent reasonable

suspicion that additional criminal activity is afoot. *Rodriguez-Escalera*, 884 F.3d at 668. Here, the Court agrees with Trooper David that, based on the undisputed facts, he had independent reasonable suspicion to continue the stop for approximately 25 minutes, and probable cause to arrest her.

Trooper David points to his knowledge of Molina's history of driving under the influence, her traffic violation, her inability to recognize him from the previous stop, the smell of alcohol in her vehicle, her bloodshot eyes, and her slurred speech, all made it reasonable to conduct a FST. Reply at 5. Molina disputes that her eyes were bloodshot, citing her arrest photograph, so the Court finds there to be a dispute of fact and does not consider that Molina's eyes were bloodshot. Resp. DSOF ¶ 47. Molina also disputes that she was slurring her speech and smelled like alcohol, but in support she cites only to her expert, Ronald E. Henson, PhD, whose testimony does not stand for the proposition that Trooper David did not smell alcohol or observe that Molina was slurring her speech. *Id*. Rather, Dr. Henson testified that the odor of an intoxicating beverage does not have any scientific value to determine intoxication or impairment. Pl.'s Exh. 6, Henson Dep. Tr. at 21:22–22:13. While that may be true, and Trooper David provides no evidence to the contrary, as stated above, when making a determination of probable cause (or the lesser determination of reasonable suspicion, "a court must consider the facts as they reasonably appeared to the arresting officer." *Holmes*, 511 F.3d at 679. And, as stated below, the Seventh Circuit has noted that the smell of alcohol is an indicator of intoxication. *See Gutierrez v. Kermon*, 722 F.3d 1003, 1012 (7th Cir. 2013).

35

Accordingly, the Court considers Trooper David's statements of fact that he smelled alcohol in Molina's car and observed her slurring her speech. These indicators, combined with Molina running a red light, are consistent with common indicia of intoxication. *See Gutierrez*, 722 F.3d at 1012; *see also Garcia v. City of Chicago*, 2019 WL 4450499, at *5 (N.D. Ill. Sept. 17, 2019) (collecting cases). Altogether, those facts, combined with Trooper David's knowledge of her history of DUI, provided reasonable suspicion for Trooper David to conduct a FTS. *See, e.g.*, *Konsionowski v. Sikorski*, 2022 WL 613297, at *4 (E.D. Wis. Mar. 2, 2022); *c.f. Best v. Berard*, 837 F. Supp. 2d 933, 940 (N.D. Ill. 2011).

Therefore, the Court rejects Molina's allegation that the 25 minutes from traffic stop to arrest was an unreasonable seizure under the factual circumstances presented in this case. Molina argues that "[t]his Court must consider the facts of this case in light of prior Seventh Circuit holdings." Pl.'s Resp. David at 6. Yet, despite inviting the Court to consider prior Seventh Circuit cases on the issue, Molina cites to no authority for her proposition that her detention for approximately 25 minutes before arrest is too long under the circumstances where Trooper David had reasonable suspicion to conduct a FST and she subsequently failed the FST.[7]

---

[7]To the extent Molina argues that the pre-arrest stop took 90 minutes and therefore the "stop" was unlawfully extended, Pl.'s Resp. David at 7, Molina also acknowledges that she was arrested at 5:21 a.m., *id.* at 6, and for the reasons discussed below, *see infra* Section I.A.3, and the Court considers the period between her arrest at 5:21 a.m. to 9:23 a.m. (after she was booked and received an intoximeter) to be one seizure.

### 3. Probable Cause for Arrest

Molina maintains that her arrest was also unlawful as it was not supported by probable cause. Pl.'s Resp. David at 3. Based on numerous objective factors, including the fact that Molina failed the FST, there was probable cause to arrest her, posits Trooper David. *Id.* at 4–5; David Memo. Summ. J. at 9–10.

The Court agrees with Trooper David that there is no material question of fact that Trooper David had probable cause to arrest Molina for DUI. As his report reflects, and Molina admits, she failed each component of the FST. Resp. DSOF ¶ 54. Molina, however, tries to explain why she failed the FST. In support, Molina cites the testimony of her expert witness, Ronald E. Henson, PhD, who testified that the National Highway Traffic Safety Association (NHTSA) admonishes against the FST in wind and rain conditions which may interfere with the test's administration. PSOAF ¶ 78. Dr. Henson further testified that proper protocol is to advise the person they are not under arrest, but relocate them to a location out of the elements to conduct the test. *Id.* ¶ 79. Moreover, he testified that the NHTSA requires a dry surface for the walk and turn balancing test, "because rain and wind can impact an officer's ability to make a proper assessment of intoxication, which was the case here as there was rain, wind and cold weather evidence on the video." *Id.* ¶ 80. Additionally, Dr. Henson testified that glassy eyes are not associated with alcohol intoxication, blood shot eyes are not conclusive evidence as an indicator for intoxication, and that the scent of alcohol and bloodshot eyes taken together are not conclusive for alcohol impairment, either. *Id.* ¶ 82. Lastly, he opined that a breath

test done more than 4.5 hours after a traffic stop cannot be used to determine a driver's BAC at the time of driving, and that a DUI arrest should take two hours. *Id.* ¶¶ 83–84.

True, Molina has submitted evidence that the FST was not carried out in an ideal environment, however, the Court finds this does not create any genuine issue of fact. *Penn v. Chicago State U.*, 162 F. Supp. 2d 968, 975–76 (N.D. Ill. 2001), *aff'd sub nom. Penn v. Harris*, 296 F.3d 573 (7th Cir. 2002) ("[A] dispute concerning some facts relevant to the probable cause analysis does not preclude a finding of probable cause so long as the finding survives after adopting the plaintiff's version of the disputed facts for which there is some support in the record."). Moreover, it is undisputed that Molina blew over the legal limit – .11, which is .03 over the legal limit – several hours after the original traffic stop. Resp. DSOF ¶ 106. Although Molina contends that a breathalyzer is not without a measure of uncertainty, and the manufacturer of the device says its reliability is plus or minus .005, even accepting and applying that minus .005, she blew in excess of the legal limit several hours after she was initially stopped by Trooper David. *See id.* All in all, the Court finds that, based on the above, that Trooper David had probable cause to arrest Molina for DUI.

### 3. Time Between Arrest and Booking

The Court now turns to the amount of time between the arrest at 5:21 a.m. and the time Molina's booking was completed at approximately 9:23 a.m., after she received a breathalyzer test. Molina claims that her detention during this period was

excessive and therefore violated the Fourth Amendment.[8] Pl.'s Resp. David at 6–7. The reasonableness of the length of a detention, argues Molina, "is a question best left open for juries to answer based on the facts presented[.]" *Id.* at 6 (quoting *Lewis v. O'Grady*, 853 F. 2d 1366, 1370 (7th Cir. 1988)). Molina cites to other cases where seizures of a comparable amount of time support that the seizure may be unreasonable. *See Moore*, 754 F.2d at 1351 (remanding issue of length of detention back to district court where "there is no evidence in the record warranting any conclusion justifying the four or more hour time period spent by the plaintiffs in the jail"); *Gramenos*, 797 F.2d at 437 (remanding for further proceedings where plaintiff was detained for "an unexplained four hours of detention in the dead of night").

Between Molina's arrest at 5:21 a.m. and arriving at the 16th District at approximately 9:00 a.m. when the booking process began, the undisputed record shows that Molina was never removed from Trooper David's squad car, and although she was un-handcuffed at one point and told she would not be processed, she was still not free to leave during this nearly four-hour ordeal. And, after she arrived at the 16th District, although Molina was no longer confined to Trooper David's car, she was still not free to leave, as she waited for a "required 20-minute observation period" before Trooper David administered a breathalyzer test at 9:23 a.m. DSOF ¶ 106. Thus, the Court considers the detention from her arrest until the breathalyzer test as one seizure.

---

[8]Molina contends that the approximately five-hour period between the time she was pulled over until she was booked was unreasonable, Pl.'s Resp. David at 7; however, for the reasons discussed above, *see supra* Section I.A.2, the Court finds that no unreasonable seizure occurred between the traffic stop at 4:55 a.m. and Molina's arrest at 5:21 a.m.

The Court finds, in viewing the evidence in the light most favorable to Molina, the non-movant, that a reasonable jury could return a verdict in her favor. *Anderson*, 477 U.S. at 248. Trooper David has not advanced a sufficient explanation warranting the length of the detention. Indeed, the evidence leaves many unanswered questions. For example, why did Troper David drive Molina around for hours before booking? Why was Trooper David's dashcam video turned off? Why did Trooper David tell Molina she would not be booked and then returned for booking? Why would Trooper David prevent her from calling someone to pick her up from the station when she was allegedly not under arrest anymore? Moreover, Molina's allegations of Trooper David's conduct throughout the ordeal support that, if believed, Trooper David's actions constituted "delay deliberately created so that the process becomes the punishment[,]" in clear violation of the Fourth Amendment. *Portis*, 613 F.3d at 705. Trooper David has not identified a comparable case where a seizure of this length of time was held, on summary judgment, to be reasonable such that it did not constitute an unreasonable seizure.

Here, it is undisputed that the entire incident after arrest took approximately four hours, which is in excess of a normal DUI stop, as argued by all parties, and as supported by Molina's expert. The Seventh Circuit has held a detention of such length requires an explanation. *See Gramenos*, 797 F.2d at 437. Although Trooper David has offered reasons for some of the prolonged period of time of the stop (e.g. letting Molina weigh her options and orders from Trooper David's superiors), the Court cannot say, as a matter of law, that the reasons offered by Trooper David justify the length of the

entire incident. *See Portis*, 613 F. 3d at 704–05 (explaining that the *Gramenos-Chortek* framework should be applied in a case-by-case basis in light of "the reasons why release was deferred"). Further still, as stated above, controlling case law provides that "[t]he reasonableness of a length of detention typically is a question best left open for juries to answer based on the facts presented in each case." *Lewis v. O'Grady*, 853 F.2d at 1370. Here, it is for the jury to determine whether the four hours it took Trooper David to process Molina was reasonable. The Court agrees with Molina that the reasonableness of the seizure is a question of fact appropriate for resolution by the fact finder, and not by the Court. That is not, however, the end of the analysis, as the Court must address Trooper David's argument that qualified immunity shields him from liability.

### 4. Qualified Immunity

Qualified immunity "'shields officials from civil liability so long as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known.'" *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (*per curiam*)). "The doctrine of qualified immunity balances dueling interests—allowing officials to perform their duties reasonably without fear of liability on the one hand and affording members of the public the ability to vindicate constitutional violations by government officials who abuse their offices on the other." *Lopez v. Sheriff of Cook Cty.*, 993 F.3d 981, 987 (7th Cir. 2021) (cleaned up). "The purpose of qualified immunity is to protect 'all but the plainly incompetent or those who knowingly violate the law.'" *Humphrey v.*

*Staszak*, 148 F.3d 719, 727 (7th Cir. 1998) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Qualified immunity is an affirmative defense, but once a defendant properly raises the defense, the burden shifts to the plaintiff to defeat it. *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 2722 (2020). Here, Trooper David has properly raised the defense of qualified immunity, *see, e.g.*, *Buchanan v. Pfister*, 2020 WL 902829, at *12 (N.D. Ill. Feb. 25, 2020), so Molina bears the burden of defeating the defense, *see Leiser,* 933 F.3d at 701.

To defeat a defense of qualified immunity, Molina must establish that: (1) Trooper David's conduct violated a constitutional right, and (2) the violated right was clearly established at the time of the alleged misconduct. *Lewis v. Downey*, 581 F.3d at 478 (cleaned up). "A plaintiff can show that a right is 'clearly established' by statute or constitution in at least two ways: (1) [s]he can point to an analogous case establishing the right to be free from the conduct at issue; or (2) [s]he can show that the conduct was 'so egregious that no reasonable person could have believed that it would not violate clearly established rights.'" *Steidl v. Fermon*, 494 F.3d 623, 632 (7th Cir. 2007) (quoting *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001)). A right is "clearly established" if the conduct is so clearly prohibited that every "reasonable official would [have understood] that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). There need not be a case exactly on point for a right to be clearly established, but "existing precedent must place the lawfulness of the particular arrest beyond debate." *D.C. v. Wesby*, 583 U.S.

42

48, 64 (2018) (cleaned up); *see also Alicea v. Thomas*, 815 F.3d 283, 291 (7th Cir. 2016) ("[A] case holding that the exact action in question is unlawful is not necessary. Even where there are notable factual distinctions, prior cases may give an officer reasonable warning that his conduct is unlawful.") (cleaned up). Still, the right must have been clearly established "in a particularized sense, rather than at a high level of generality." *Id.* Put another way, "the official must have [had] fair warning that his conduct [was] unconstitutional." *Roe v. Elyea*, 631 F.3d 843, 859 (7th Cir. 2011) (cleaned up).

Trooper David posits that, even if the Court finds a question of fact as to whether Molina's Fourth Amendment rights were violated, he is still entitled to qualified immunity because Molina has not identified any clearly established right that was violated. David Memo. Summ. J. at 13. The way he sees it, the investigatory stop only lasted approximately 40 minutes. This included stopping Molina, explaining why he stopped her, running her license, discussing whether she had been drinking, and conducting a FST, at which point he placed her under arrest. *Id.* at 13–14. Trooper David explains that the remaining time when Molina was placed under arrest, and transported to the First District, was not part of his investigation. *Id.* at 14. Although Trooper David does not explicitly address the remainder of the seizure after transporting Molina to the First District, he argues that he is entitled to immunity because he had probable cause to arrest Molina for DUI, and his temporary delay in taking her for processing was not a violation of any clearly established right "to not have her stop minimally delayed in order to see if the processing of her arrest

could be avoided." *Id.* at 14–15. Any reasonable officer submits Troper David, "would have believed that these actions did not violate" Molina's rights. *Id.* at 15.

Predictably, Molina disagrees. Molina asserts that Troper David is not entitled to qualified immunity because a reasonable officer would know that a post-arrest detention, consisting of taking an arrestee to several different police stations all over the City, to process the arrestee, while the arrestee remains in the squad car over a four hour period, animated by ill will, constitutes a violation of a clearly established right. Pl.'s Resp. David at 9.

An officer is permitted to detain an arrestee for a "brief period . . . to take the administrative steps incident to arrest." *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975). Reasonable administrative steps include "transportation, booking, filing," etc. *Patrick v. Jasper Cnty.*, 901 F.2d 561, 567 (7th Cir. 1990). "A justifiable administrative delay in processing an arrestee, arising from practical realities such as unavoidable delays in transporting arrested persons from one facility to another or handling late-night bookings where no magistrate is readily available, does not violate the Fourth Amendment." *Murdock v. City of Chicago,* 565 F. Supp. 3d 1037, 1041 (N.D. Ill. 2021) (cleaned up). However, a delay motivated by an improper purpose, a delay motivated by ill will, or delay for the sake of delay is unreasonable and violates the Fourth Amendment. *See Chortek*, 356 F.3d at 746; *Portis*, 613 F.3d at 705 ("Needless delay, or delay for delay's sake—or, worse, delay deliberately created so that the process becomes the punishment—violates the fourth amendment.").

44

Here, as Trooper David points out in reply, Molina does not cite any cases (beyond those setting forth general propositions of law) in the section of her response addressing Trooper David's qualified immunity argument. *See* Pl.'s Resp. David at 8–9. However, she does so in the section responding to Trooper David's argument that Molina was not subject to any unlawful seizure because he had probable cause to initiate the traffic stop and to arrest her for DUI. *Id.* at 5–6. Indeed, as discussed above, Molina cites several cases for the proposition that the length of time to complete administrative steps incident to arrest must be reasonable. *Id.* at 5 (citing *Chortek*, 356 F.3d at 746–47; *Moore*, 754 F.2d at 1350; *Gramenos*, 797 F.2d at 436–437).

Those cases stand for the proposition that "detentions as brief as four hours could be excessive and must be justified." *Portis*, 613 F.3d at 705 (citing *Chortek*, 356 F.3d 740; *Gramenos*, 797 F.2d 432). However, as stated above, a right must be *clearly established*, in that there is analogous caselaw or the conduct was "so egregious that no reasonable person" could believe that it was constitutional. *Steidl*, 494 F.3d at 632 (cleaned up). Based on the authority presented by Molina, the Court cannot say that "the lawfulness of the particular arrest [is] beyond debate." *Wesby*, 583 U.S. at 64 (cleaned up). That is, although it is true that the Seventh Circuit has noted that detentions similar in length to Molina's "could be" excessive, the cases are also clear that there is no "bright-line" rule, or set timeframe, by which an arrestee must be processed, and even four hour detentions might not be excessive *if justified*. *Portis*, 613 F.3d at 705 ("The reasonableness requirement of the fourth amendment is a

standard, not a rule."); *see also Moore*, 754 F.2d at 1350 ("[T]he underlying principle that the purpose of detention is to ensure the defendant's presence at trial applies equally to the time of detention. . . . if detention is *not justified*, it amounts to punishment prior to conviction.") (emphasis added).

Here, Trooper David has provided justification for almost the entire length of the detention. First, after arresting her at 5:21 a.m., it is undisputed that Trooper David asked Molina to take a breathalyzer test several times, and allowed her to speak to her boyfriend about the option. DSOF ¶¶ 63, 65. And, after Trooper David's decision to drive Molina to the First District on the opposite side of the City, which took approximately 17 minutes, *id.* ¶ 74—plus an additional 20 to 30 minutes while Trooper David went into the First District, Resp. DSOF ¶ 78—all delays in processing Molina came from orders from Trooper David's superiors. *See* DSOF ¶ 79 ("While at the First District, Trooper David was directed to take [Molina] to the Sixteenth District."); *id.* ¶ 99 (at the Sixteenth District, "Trooper David was then instructed to release [Molina] and drive her home, or to where she wanted to go"); *id.* ¶ 102 ("En route to [Molina's] boyfriend's house, . . . Master Sergeant McGreal instructed Trooper David and Master Sergeant Jimenez to stop and await further instruction."); *id.* ¶ 104 ("Trooper David was told to return to the CPD Sixteenth District, with [Molina], where she would be processed."); *see also id.* 105–06 (Trooper David brought Molina to the Sixteenth District for processing, and waited the required 20-minute observation period before administering a breathalyzer test).[9]

---

[9]These statements of fact are supported primarily by Trooper David and Sergeant Jimenez's deposition testimony, some of which include Trooper David's statements of being told to take

True, the Court agrees with Molina that no reasonable officer would have made the decision to initially drive Molina to the First District on the other side of town for processing, when there were much closer precincts. But that decision amounted to no more than 47 minutes (accounting for driving time and the time Trooper David was inside the precinct while Molina remained in the car), and Molina has provided no authority that an unjustified detention of that length amounts to an unconstitutional seizure. And, as described above, Trooper David provided justification for the other approximately 3 hours and 15 minutes between Molina's arrest and completion of the second breathalyzer test. Where Seventh Circuit law states that a four-hour detention "without justification" may be unconstitutional, the Court cannot find that "every reasonable officer" would have believed that detaining someone for that amount of time, primarily because of orders from his superiors, would have understood that he was violating a clearly established right. *See Anderson*, 483 U.S. at 640. So, although the Court, as described above, *see supra* Section I.A.3, questions Trooper David's justifications, based on the law before it, it finds that he is entitled to qualified immunity.[10]

---

certain actions from other law enforcement officers. Molina, however, does not make any objections based on hearsay.

[10]This is true even accounting for Molina's evidence that Trooper David taunted her and showed her a video of her past arrest while driving her from the First District to the Sixteenth District, Resp. DSOF ¶¶ 94–96; as best the Court can tell, the clearly established Fourth Amendment right Molina claims Trooper David violated was the right to be free from excessive detention. So, even if he engaged in reprehensible conduct during that period of detention, based on the undisputed evidence, the delay caused by the drive from the First to the Sixteenth District was due to an order from Trooper David's superior, DSOF ¶ 79—not Trooper David's bad conduct—which, as discussed above, is a justification that the Court finds a reasonable officer would find warranted a detention of approximately four hours.

Finally, the Court must point out that the cases cited by Molina in support of finding that a four-hour detention violates an established right did not evaluate that right in the face of qualified immunity arguments raised by the defendant-officers. Indeed, in both *Moore* and *Gramenos*, the Seventh Circuit remanded because there was no evidence in the record that the officers had raised—or the district court had considered—any explanation for the four-hour detention. *See Moore*, 754 F.2d at 1350–51 (7th Cir. 1985) ("There is no evidence in the district court opinion or the parties' affidavits and/or briefs in support of summary judgment justifying the length of detention")); *Gramenos*, 797 F.2d at 436–37 ("The magistrate did not discuss this claim."). And in *Chortek*, the Seventh Circuit was satisfied by the officers' explanation that a backlog caused delays, even where the plaintiffs' detention times were, on average, much longer than four hours. 356 F.3d at 747–48. Again, qualified immunity was not an issue raised before the Seventh Circuit as to the excessive detention claims in *Chortek*, *Moore*, or *Gramenos*. So, while they are helpful in determining whether an individual has a clearly established right not to be unjustifiably detained for four hours or more, they offer no insight into whether the Seventh Circuit would find qualified immunity appropriate—or not—based on the facts here. And, as stated above, because Trooper David has properly raised the defense of qualified immunity, Molina bears the burden of defeating the defense. *See Leiser,* 933 F.3d at 701. The Court finds that she has not met that burden.

For the reasons stated above, Trooper David's motion for summary judgment on Count I is granted in all respects. The Court now turns to Trooper Latronico's motion for summary judgment.

### B. Trooper Latronico's Liability

As previously noted, Molina brings claims not only against Trooper David, who made the traffic stop, but also against Trooper Latronico.

To hold Trooper Latronico liable, Molina must show that he was personally responsible for the deprivation of her rights. *Wilson v. Warren County, Illinois*, 830 F.3d 464, 469 (7th Cir. 2016). "A defendant is personally responsible 'if the conduct causing the constitutional deprivation occurs at his direction or with his knowledge and consent.'" *Id.* (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). "In short, some causal connection or affirmative link between the action complained about and the official sued is necessary for § 1983 recovery." *Gentry*, 65 F.3d at 561. That is, Molina must show that Trooper Latronico knew that the primary actor (Trooper David) "was acting wrongfully and facilitated it, approved it, condoned it, or turned a blind eye." *Pepper v. Village of Oak Park*, 430 F.3d 805, 811 (7th Cir. 2005) (cleaned up).

Trooper Latronico advances many of the same arguments as Trooper David with respect to the lawfulness of Molina's seizure. Latronico Memo. Summ. J. at 10–14. However, Trooper Latronico posits, in the alternative, that even if Molina's Fourth Amendment rights were violated, Molina has adduced no evidence he was in any way involved in the September 30, 2016 incident. *Id.* at 15–16. Specifically, Molina's

speculation about his involvement is insufficient at this stage and cannot be used to create any genuine issue of fact. *Id.* at 16.

In response, Molina contends that Trooper Latronico "set the entire situation in motion" by screenshotting the photo of the Blue Light bar, and communicating with Trooper David her whereabouts on the night of the incident. Pl.'s Resp. Latronico at 9–10. Molina insists he facilitated Trooper David's conduct, and that "[o]therwise, it is just too much of a coincidence" that Trooper David was located in a situation where he ultimately pulled her over. *See* Pl.'s Resp. David at 8; Pl.'s Resp. Latronico at 10. Molina asserts that "[t]he causal connection or affirmative link here is Snapchat[,]" a platform where messages disappear, and where she submits Trooper David and Trooper Latronico must have communicated about her whereabouts. Pl.'s Resp. Latronico at 10. Molina also contends that she overheard Trooper Latronico on the phone with Trooper David during the incident. DSOF ¶ 86.

The Court agrees with Trooper Latronico. Upon review of the record, viewed in the light most favorable to Molina, the Court finds that Molina has not adduced or pointed to any evidence which links Trooper Latronico to the September 30, 2016 incident.[11] Both Trooper David and Trooper Latronico have stated they did not communicate on the date in question. DSOF ¶ 93. There is no evidence supporting any communications between them on any platform during the incident anywhere in the record. Similarly, Molina's allegation that Trooper Latronico took a screenshot of

---

[11]True, the Court denied Trooper Latronico's Rule 12(b)(6) motion to dismiss on this point. *Molina v. Latronico*, 430 F. Supp. 3d 420 (N.D. Ill. 2019). But at that juncture, the Court found that Molina had plausibly *alleged* Trooper Latronico's involvement. At summary judgment, Molina is required to adduce evidence, which she fails to do.

her location posted on Snapchat is not supported by the Snapchat record in evidence, which does not reflect that any screenshot was taken. This is so, even crediting Molina's testimony that she received a notification that Trooper Latronico screenshot the photo the next day, after the incident. DSOF ¶ 32; Resp. DSOF ¶ 32. However, there is no record evidence identified by Molina to support her testimony, such as a copy of the notification, whereas the Snapchat record supports Trooper Latronico's denial of taking any screenshot. Similarly, as the phone records do not support any communication between Trooper David and Trooper Latronico, the Court cannot credit Molina's speculation that she thought she heard Trooper Latronico's laughter when Trooper David was speaking on the phone during her arrest. Resp. DSOF ¶ 86. True, the facts of this case smell like three-day old fish. But beyond Molina's speculation, there is no evidence in the record that would convince a trier of fact to accept that Trooper Latronico facilitated the stop, approved it, condoned it, or turned a blind eye. *See Pepper*, 430 F.3d at 811. Critically, the Seventh Circuit has repeatedly stated that "summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (cleaned up). Speculation will not suffice to support Molina's claim against Trooper Latronico at the summary judgment stage. *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001) ("[I]t is well-settled that speculation may not be used to manufacture a genuine issue of fact.").

51

Therefore, given that the record does not include any evidence of any knowledge or involvement by Trooper Latronico in the September 30, 2016 stop and arrest, no reasonable jury could find that he was liable under Section 1983. *See Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) (cleaned up) ("An *individual* cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation."). While this case leaves the Court with the unmistakable impression that "something is rotten in the state of Denmark," in the absence of any evidence suggesting his involvement, Trooper Latronico's motion for summary judgment as to Count I is granted.

## II.    State Law Claims

Molina also asserts claims for civil conspiracy, malicious prosecution, and intentional infliction of emotional distress claims under Illinois law. The Court must determine whether it is appropriate to exercise supplemental jurisdiction over these state law claims pursuant to 28 U.S.C. § 1367. For the following reasons, the Court declines to exercise supplemental jurisdiction over these claims and dismisses them without prejudice.[12]

"When federal claims drop out of the case, leaving only state-law claims, the district court has broad discretion to decide whether to keep the case or relinquish supplemental jurisdiction over the state-law claims." *RWJ Mgmt. Co. v. BP Prod. N. Am., Inc.*, 672 F.3d 476, 478 (7th Cir. 2012); *see* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the

---

[12]Therefore, the Court need not address Defendants' arguments as to the state law claims— regarding the sufficiency of the evidence or whether any type of immunity bars the claims.

district court has dismissed all claims over which it has original jurisdiction . . . .").

When deciding whether to exercise supplemental jurisdiction, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *City of Chi. v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (cleaned up).

"When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims." *RWJ Mgmt.*, 672 F.3d at 479 (cleaned up); *see also Groce v. Eli Lilly*, 193 F.3d 496, 501 (7th Cir. 1999); ("[T]he usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial."). "The presumption is rebuttable, but it should not be lightly abandoned, as it is based on a legitimate and substantial concern with minimizing federal intrusion into areas of purely state law." (cleaned up).

Exceptions to the general rule exist: "(1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided." *Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008) (cleaned up).

Here, relevant factors weigh in favor of the Court following the "usual practice" in the Seventh Circuit and relinquishing supplemental jurisdiction. *Groce*, 193 F.3d at 501. The Court has not expended significant resources on the pending state law

claims. To the extent the parties have during discovery, those efforts can be duplicated in state court with relative ease. While the parties have briefed summary judgment on those claims, the Court has not yet decided them, and based on the Court's review of the briefs, it is not "absolutely clear how the pendant claims can be decided." *Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 515 (7th Cir. 2009) (cleaned up). And, as always, comity favors allowing state courts to decide issues of state law. *See RWJ Mgmt.*, 672 F.3d at 479.

Additionally, no exception to the standard practice of relinquishing supplemental jurisdiction over state law claims in the absence of a federal claim applies here. The statute of limitations will not have run on Molina's state law claims, as both federal and state law toll the relevant limitations period when claims are pending in a civil action. *See* 28 U.S.C. § 1367(d); 735 ILCS 5/13-217; *Gendek v. Jehangir*, 518 N.E.2d 1051, 1053 (Ill. 1988) ("The purpose of section 13–217 . . . is to facilitate the disposition of litigation upon the merits and to avoid its frustration upon grounds that are unrelated to the merits").

For these reasons, the Court exercises its discretion to relinquish supplemental jurisdiction over the remaining state law claims.

## Conclusion

For the foregoing reasons, Trooper David and Trooper Latronico's motions for summary judgment [88], [90] are granted as to Count I, and the Court relinquishes

supplemental jurisdiction over Molina's state law claims (Counts II–IV) and those claims are dismissed without prejudice. Civil case terminated.

Dated: March 31, 2024

United States District Judge
Franklin U. Valderrama